# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                              )
TUNICA-BILOXI TRIBE OF LOUISIANA )
 and RAMAH NAVAJO                            )
SCHOOL BOARD, INC.,                          )
                                              )
                  Plaintiffs,                 )
                                              )
          v.                                  )          Civil Action No. 02-2413  (RBW)
                                              )
UNITED STATES OF AMERICA, et al. ,           )
                                              )
                  Defendants.                 )
_____)

## MEMORANDUM OPINION

The Tunica-Biloxi Tribe of Louisiana ("Tunica") and the Ramah Navajo School Board,

Inc. ("Ramah Navajo"), the plaintiffs in this civil lawsuit, seek declaratory and injunctive relief

along with monetary damages against the United States of America, Michael O. Leavitt in his

official capacity as the Secretary of the Department of Health and Human Services, and Dirk A.

Kempthorne in his official capacity as the Secretary of the Department of the Interior, under the

Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613 (2000) (the "CDA"), for alleged "massive

violations" of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. §§ 450-

450n (2000) (the "Indian Self-Determination Act" or the "Act").  Second Amended Class Action

Complaint (the "Compl.") ¶ 1.  Currently before the Court is the defendants' renewed motion to

dismiss in part the plaintiffs' second amended complaint pursuant to Federal Rule of Civil

Procedure 12(b)(1) and for summary judgment pursuant to Federal Rule of Civil Procedure 56,

along with the plaintiffs' renewed cross-motion for partial summary judgment pursuant to Rule

56.  Upon carefully reviewing the plaintiffs' second amended complaint, the parties' motions,

and all memoranda of law and exhibits submitted by the parties,[1] the Court concludes that it must grant in part and deny in part the defendants' motion, deny in part the plaintiffs' cross-motion, and stay further consideration of the parties' cross-motions for the reasons that follow.

## I. Background

Except where indicated otherwise, the following facts are either undisputed or matters of public record.  Finding that "the prolonged [f]ederal domination of Indian service programs ha[d] served to retard rather than enhance the progress of the Indian people and their communities by depriving Indians of the full opportunity to develop leadership skills crucial to the realization of self-government," 25 U.S.C. § 450(a)(1), Congress passed the Indian Self-Determination Act in 1975 to "permit an orderly transition from the [f]ederal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services," id. § 450a(b).  The Act was intended to assist in the accomplishment of the "major national goal" of "provid[ing] the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life areas of their choice, and to achieve the measure of self-determination essential to their social and economic well-being."  Id. § 450a(c).

---

[1]  In addition to the plaintiffs' second amended complaint, the defendants' motion to dismiss in part and for summary judgment, and the plaintiffs' cross-motion for partial summary judgment, the Court considered the following documents in reaching its decision: (1) the Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss and for Summary Judgment (the "Defs.' Mem."), (2) the Defendants' Statement of Material Facts (the "Defs.' Facts"), (3) the Renewed Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Partial Summary Judgment and Renewed Opposition to Defendants' Motion to Dismiss or for Summary Judgment (the "Pls.' Mem."), (4) the Plaintiffs' Response to Defendants' Statement of Material Facts (the "Pls.' Resp."), (5) the Plaintiffs' Statement of Material Facts Not in Genuine Dispute in Support of Renewed Motion for Partial Summary Judgment (the "Pls.' Facts"), (5) the Defendants' Combined Opposition to Plaintiffs' Motion for Partial Summary Judgment and Reply in Support of Motion to Dismiss and for Summary Judgment (the "Defs.' Reply/Cross-Opp'n"), (6) the Defendants' Response to Plaintiff's Statement of Material Facts, (7) the Plaintiffs' Reply in Support of Motion for Partial Summary Judgment (the "Pls.' Cross-Reply"), and (8) the Plaintiffs' Notice of Recent Authority.

Pursuant to the Indian Self-Determination Act, the Secretary of the Department of Health and Human Services and the Secretary of the Department of the Interior are "directed, upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof" that are administered by those Secretaries "for the benefit of Indians because of their status as Indians." Id. § 450f(a)(1). The Act provides that "a tribal organization may submit a proposal for a self-determination contract, or a proposal to amend or renew a self-determination contract," to the applicable Secretary, after which the Secretary "shall, within ninety days after receipt of the proposal, approve the proposal and award the contract" unless the Secretary finds that one or more of five statutory criteria for declination have been met. Id. § 450f(a)(2). These criteria for declination include a finding that "the amount of funds proposed under the contract is in excess of the applicable funding level for the contract[] as determined under [the Act]." Id. § 450f(a)(2)(D).

"Whenever the Secretary declines to enter into a self-determination contract or contracts" in whole or in part, he must "state any objections in writing to the tribal organization" and "provide assistance to the tribal organization to overcome the stated objections." Id. § 450f(b)(1)-(2). Further, he must "provide the tribal organization with a hearing on the record with the right to engage in full discovery relevant to any issue raised in the matter and the opportunity for appeal on the objections raised." Id. § 450f(b)(3). Alternatively, "the tribe or tribal organization may, in lieu of filing such an appeal, exercise the option to initiate an action in a [f]ederal district court." Id. However, even if the Secretary finds that the level of funding proposed for a self-determination contract is too high, the Secretary is required to approve the

remainder of the contract with "a [lower] level of funding [that is] authorized under [the Act]." Id. § 450f(a)(4)(B).

The "level of funding authorized" by the Indian Self-Determination Act is determined in accordance with 25 U.S.C. § 450j-1.  That section provides that "[t]he amount of funds provided under the terms of self-determination contracts . . . shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract."  Id. § 450j-1(a)(1).  In addition to this baseline level of funding, also known as the "Secretarial amount," "[t]here shall be added . . . contract support costs," id. § 450j-1(a)(2), which "include the costs of reimbursing each tribal contractor for reasonable and allowable costs of" both "(i) direct program expenses for the operation of the [f]ederal program that is the subject of the contract" as well as "(ii) any additional administrative or other expense related to the overhead incurred by the tribal contractor in connection with the operation of the [f]ederal program, function, service, or activity pursuant to the contract," provided such funding does not duplicate the Secretarial amount, id. § 450j-1(a)(3)(A).  Further, "the tribe or tribal organization shall have the option to negotiate with the Secretary the amount of funds that the tribe or tribal organization is entitled to receive" under the contract.  Id. § 450j-1(a)(3)(B).

There are two statutory restrictions on the amount of funding that the Secretary may provide for self-determination contracts pursuant to § 450j-1.  First, "[n]otwithstanding any other provision in [the Indian Self-Determination Act], the provision of funds . . . is subject to the availability of appropriations[,] and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization."  Id. § 450j-1(b).  Second, "[b]efore, on, and after October 21, 1998, . . . funds

available to the Indian Health Service . . . for Indian self-determination or self-governance

contract or grant support costs may be expended only for costs directly attributable to contracts,

grants[,] and compacts" issued pursuant to the Act, "and no funds appropriated by [the Act] shall

be available for any contract support costs or indirect costs associated with any contract, grant,

cooperative agreement, self-governance compact, or funding agreement entered into between an

Indian tribe or tribal organization and any entity other than the Indian Health Service." Id.

§ 450j-2.  This same restriction applies to all "funds available to the Department of the Interior"

from November 29, 1999, onwards.  Id. § 450j-3.

The Indian Self-Determination Act also restricts the terms of self-determination

contracts.  Pursuant to 25 U.S.C. § 450j(c)(1)(A), a self-determination contract may not last

longer than three years "in the case of [anything] other than a mature contract, unless the

appropriate Secretary and the tribe agree that a longer term would be advisable."  Mature

contracts,[2] on the other hand, may last "for a definite or an indefinite term, as requested by the

tribe."  Id. § 450j(c)(1)(B).  "The amounts of such contracts may be renegotiated annually to

reflect changed circumstances and factors, including, but not limited to, cost increases beyond

the control of the tribal organization."  Id. § 450j(c)(2).

Finally, self-determination contracts under the Act must "incorporate by reference[] the

provisions of [a] model agreement" described in the Act itself.  Id. § 450*l*(a)(1).  This model

agreement provides, inter alia, that, "[s]ubject to the availability of appropriations, the Secretary

shall make available to the [contracting Indian tribe or tribal authority] the total amount specified

in" an annual funding agreement to be executed separately and incorporated by reference in the

---

[2]  A "mature contract" is "a self-determination contract that has been continuously operated by a tribal organization for three or more years, for which there are no significant and material audit exceptions in the annual financial audit of the tribal organization."  25 U.S.C. § 450b(h).

self-determination contract.  Id. § 450*l*(c).  "Such amount shall not be less than the applicable

amount determined pursuant to [§ 450j-1]."  Id.

"Since before 1995," the plaintiffs have entered into self-determination contracts with the

Indian Health Service (the "IHS"), a component of the Department of Health and Human

Services, "to provide health services to members of federally-recognized Indian tribes pursuant

to the [Indian Self-Determination Act]."  Pls.' Facts ¶ 1.  For all of the contracts at issue here, the

plaintiffs and the IHS agreed to use a so-called "indirect cost rate"[3] negotiated by the plaintiffs

and the Office of the Inspector General (the "OIG") of the Department of Interior (the "DOI")

until 2003 and between the plaintiffs and the National Business Center, another component of

the DOI, thereafter to calculate the amount of funding necessary to cover the plaintiffs' indirect

costs.  Defs.' Facts ¶¶ 10, 16, 22, 28, 34, 40, 46, 56, 62, 68, 74, 80, 86, 92, 98, 104.  The DOI, in

turn, utilized its own version of an accounting methodology set forth in a circular created by the

Office of Management and Budget (the "OMB") known as "OMB Circular A-87" to determine

an appropriate indirect cost rate for each contract.  Pls.' Facts ¶ 16.  OMB Circular A-87, now

codified at Part 225 of Title 2, Subchapter A, Chapter II of the Code of Federal Regulations, Cost

Principals for State, Local, and Indian Tribal Governments, 2 C.F.R. § 225.45 (2008), delineates

the appropriate method for calculating state and local indirect cost rates.  Under that

methodology,

> Where a grantee agency's major functions benefit from its indirect
> costs to approximately the same degree, the allocation of indirect
> costs may be accomplished by classifying the grantee agency's
> total costs for the base period as either direct or indirect[] and
> dividing the total allowable indirect costs . . . by an equitable
> distribution base.  The result of this process is an indirect cost

---

[3] The term "indirect cost rate" is defined by the Indian Self-Determination Act to mean "the rate arrived at through negotiation between an Indian tribe or tribal organization and the appropriate [f]ederal agency."  25 U.S.C. § 450b(g).

rate[,] which is used to distribute indirect costs to individual [f]ederal awards. The rate should be expressed as the percentage [that] the total amount of allowable indirect costs bears to the base selected.

Id. § 225 app. E(C)(2)(a). "The distribution base may be total direct costs . . . , direct salaries and wages, or another base [that] results in an equitable distribution." Id. § 225 app. E(C)(2)(c).

Following the guidelines set forth in Appendix E to Part 225, the DOI used the "total direct costs" necessary to support the tribal function at issue as the "equitable distribution base" for purposes of calculating the appropriate indirect cost rate to be used in the contracts at issue here. This process was explained succinctly by the Tenth Circuit in Ramah Navajo Chapter v. Lujan, 112 F.3d 1455 (10th Cir. 1997) ("RNC"), as follows:

> Under this formula, the [applicable] Secretary adds all funds that will be received by a tribe in a given fiscal year, including those not received in connection with a self-determination contract, into the denominator. The numerator is the amount of indirect costs the tribe is expected to incur in a given financial year. The numerator is divided by the denominator, resulting in an indirect cost rate. To produce the amount of indirect cost funding that will be provided to a tribe in a given fiscal year, the [applicable] Secretary then multiplies the amount of direct cost funding under the self-determination contract by the indirect cost rate.

Id. at 1457.

The plaintiffs did not challenge the indirect cost rates calculated by these agencies through the DOI's appeals process. Defs.' Facts ¶¶ 6-7. Nor did they dispute any of their contracts or annual funding agreements that incorporated those calculations prior to the execution of those agreements, id. ¶¶ 50, 108, or suspend any of their contracts due to insufficient funding, id. ¶¶ 51, 109. Further, the plaintiffs did not and do not dispute that the defendants paid the amounts set forth in the parties' annual funding agreements in full. Id. ¶¶ 8-9, 14-15, 20-21, 26-27, 32-33, 38-39, 44-45, 52-55, 60-61, 66-67, 72-73, 78-79, 84-85, 90-91,

96-97, 102-103.  Rather, the plaintiffs challenge the manner in which these amounts were calculated by the DOI and implemented by the IHS.

As required by the CDA, Tunica and Ramah Navajo initially presented their disputes regarding the sufficiency of the funding they received for indirect costs in letters to the Acting Senior Contracting Officer of the IHS.  Tunica presented three separate claims in its letter, all relating to contracts spanning fiscal years 1996-2001.[4]  First, it asserted that the IHS failed to calculate the appropriate amount of indirect costs for the tribe using the indirect cost rate crafted by the DOI (the "Shortfall Claim").  Defs.' Ex. 23 (Letter from Earl J. Barbry, Sr., Chairman, Tunica-Biloxi Tribe of Louisiana, to Ralph W. Ketcher, Jr., Acting Senior Contracting Officer, Indian Health Service (Apr. 2, 2001)) (the "Tunica CDA Claim") at 1-4.[5]  Second, it claimed that the DOI miscalculated its indirect cost rate by "inclu[ding] . . . other federal agency programs in the direct cost base under OMB[]Circular A-87," which "cause[d] the indirect[]cost rate to go down" (the "Rate Dilution Claim").  Id. at 4.

Third, Tunica argued that the DOI erred in establishing "successive year indirect cost rates" by "not complying with the carry[-]forward rules established by [OMB Circular] A-87 as regards actual under-recoveries of indirect costs from other federal agencies" (the "Carry-Forward Claim").  Id. at 5.  Specifically, "none of the actual under-recoveries experienced in [fiscal year] 1996 forward were carried forward by the [DOI], but all of the actual over-recoveries of [Tunica] were carried forward."  Id. at 6.  Tunica subsequently filed a letter raising

---

[4]  Tunica entered into two self-determination contracts with the IHS covering this period of time: a contract effective in 1996 with annual funding agreements amending that contract for each year between 1996 and 1999, Defs.' Ex. 7 (Self-Determination Contract between Tunica and the IHS effective January 1, 1996) at 1-147, and a contract effective in 2000 with an accompanying annual funding agreement for that year, Defs.' Ex. 8 (Self-Determination Contract between Tunica and the IHS effective April 1, 2000) at 1-64.

[5]  Because the parties have numbered their exhibits consecutively without starting the numbering process anew when listing exhibits for the first time in their reply memoranda, the Court refers to each side's exhibits without citation to the memoranda of law to which the exhibits were attached.

identical claims with respect to its self-determination contract for fiscal year 1995.  Defs.' Ex. 24 (Letter from Earl J. Barbry, Sr., Chairman, Tunica-Biloxi Tribe of Louisiana, to Ralph W. Ketcher, Jr., Acting Senior Contracting Officer, Indian Health Service (Sept. 27, 2001)) (the "Supplemental Tunica CDA Claim") at 1-5.

Ramah Navajo filed a letter raising most of the same claims raised by Tunica in August of 2001.  Like Tunica, Ramah Navajo claimed that the IHS erred in determining the amount of funding required to cover indirect costs for Ramah Navajo's self-implementation contracts for fiscal years 1993-1996 by "adding to the [Ramah Navajo's] annual funding agreements only the estimated amount [that was] available from annual appropriations" to support indirect costs. Defs.' Ex. 26 (Letter from Jim Hooper, Jr., Administrative Services Director, Ramah Navajo Board of Trustees, to Diego Lujan, Director, Division of Contracts & Grants, Albuquerque Area Indian Health Service (Aug. 31, 2001)) (the "Ramah Navajo CDA Claim") at 2.[6]  And like Tunica, Ramah Navajo asserted that the IHS erred in adopting the flawed methodology of the DOI in using an indirect cost rate to determine the amount of indirect costs to be funded by the IHS.  Id. at 3-4.

The IHS responded to Ramah Navajo's claims first in a decision issued on December 18, 2001.  Pls.' Ex. 53, Ex. 3 (Letter from Diego G. Lujan, Contracting Officer, to Jim Hooper, Jr., Administrative Services Director, Ramah Navajo School Board, Inc. (Dec. 18, 2001)) (the "Ramah Navajo CDA Decision") at 1.  It concluded that Ramah Navajo's Shortfall Claim was without merit because Ramah Navajo's self-determination contract governing fiscal years 1993

---

[6]  These claims arise from a single self-determination contract entered into by Ramah Navajo in 1988, the terms of which were substituted in their entirety by an amendment to the contract made in 1995 to bring the parties' arrangement into conformance with the provisions of the Indian Self-Determination Act.  See Defs.' Ex. 9 (Self-Determination Contract between Ramah Navajo and the IHS effective September 21, 1988) at 1-25 (setting forth the effective date and terms of the contract as originally written); id. at 26-45 (setting forth the terms of the contract as modified and the effective date of that modification).

and 1994 "contained a specific cost ceiling beyond which there would be no additional cost to

the government," and in fiscal years 1995 and 1996 because "there were insufficient funds

available to the Albuquerque Area IHS to make additional indirect cost funds available to

[Ramah Navajo] without reducing funding for programs serving other Area tribes." Id. at 5.  The

IHS further concluded that Ramah Navajo's Rate Dilution Claim lacked merit because there was

"no evidence" that the procedure used by the DOI to calculate an indirect cost rate actually

resulted in an "adverse adjustment" to Ramah Navajo and because, in its view, the Indian Self-

Determination Act "[did] not require [the] IHS to adjust the indirect cost rate [that] the [Ramah

Navajo] negotiated with [the DOI] to compensate the tribe for indirect costs allocable to other

agencies that do not allow for full indirect cost recovery," id. at 6, but rather  "statutorily barred"

the IHS "from awarding indirect cost funding for any cost shared with any other federal

program," id. at 7.  Further, the IHS held that it "properly calculated the amount of indirect funds

associated with the [Ramah Navajo's] self-determination contract[s]" and that the amount of

funds that could be paid was limited in any event by the availability of appropriated funds.  Id.

        The IHS issued a lengthier but substantively similar decision with respect to Tunica's

claims.  Pls.' Ex. 35, Ex. 6 (Letter from Ralph W. Ketcher, Jr., Senior Contracting Officer, to

Earl Barbry, Sr., Chairman, Tunica-Biloxi Tribe of Louisiana) (the "Tunica CDA Decision") at

1.  It concluded that, with respect to Tunica's Shortfall Claim, "there were insufficient funds

available to the Nashville Area IHS to make additional indirect cost funds available to [Tunica]

without reducing funding for programs serving other Area tribes" (i.e., the same rationale

proffered with respect to Ramah Navajo's Shortfall Claim), id. at 6, and that Tunica's Rate

Dilation Claim was defective because Tunica had not established that the methodology used by

the DOI to calculate the indirect cost rate used in Tunica's self-determination contracts was

adverse to Tunica and because the IHS was not required to pay—indeed, was statutorily

prohibited from paying—for indirect costs shared with any other federal program, id. at 8-9.  The

IHS also held that Tunica's Carry-Forward Claim was without merit because Tunica "presented

no evidence that [OMB Circular] A-87 was violated" and that it was "not authorized to adjust

rates negotiated under OMB Circular A-87 unless statutorily required."  Id. at 8.

       Following these decisions, the plaintiffs initiated this lawsuit on December 9, 2002.  They

amended their complaint on February 4, 2003, and again on March 12, 2003, naming the

predecessors to the current defendants, the Interim Director of the IHS, the Inspector General of

the OIG, and the Director of the National Business Center as defendants in their official

capacities.  Compl. ¶¶ 8-13-B.  In their second amended complaint, the plaintiffs allege that the

method used by the OIG and the National Business Center to ascertain an indirect cost rate for

the plaintiffs "systematically under[-]calculates the [i]ndirect [c]ontract [s]upport [c]osts needed

to operate IHS [Indian Self-Determination Act] contracts," id. ¶ 21, and "incorrectly compute[s]

carry[-]forward adjustments under [OMB] Circular A-87," id. ¶ 23—i.e., their Rate Dilution and

Carry-Forward Claims.  According to the plaintiffs, the consequences of these alleged errors

"have been fiscal crisis, diminution of direct program services, and depletion of tribal financial

resources, in direct contravention of the purposes and policy of [the Indian Self-Determination

Act]."  Id. ¶ 24.  The plaintiffs therefore seek damages and declaratory and injunctive relief, id.

at 15, against the defendants for their alleged contractual breaches (or, in the alternative,

breaches of the implied covenant of good faith and fair dealing) and breaches of their fiduciary

duty, id. ¶¶ 34-46.[7]

---

[7]  The plaintiffs also seek class certification, see Compl. ¶¶ 26-33 (setting forth factual allegations pertaining to this request); id. at 15 (requesting "[t]hat this action be certified as a class action and that [the p]laintiffs and their counsel be approved to represent the class"), and filed a motion to that effect on April 10, 2003.  The Court stayed (continued) . . .

The defendants moved to dismiss the plaintiffs' second amended complaint on March 31, 2003. In an unpublished memorandum opinion issued on December 9, 2003, and amended on January 22, 2004, this Court granted the motion in part and denied it in part. Tunica-Biloxi Tribe of La. v. United States, Civil Action No. 02-2413 (RBW), slip op. at 1 (D.D.C. Jan. 22, 2004). Specifically, the Court "dismiss[ed] the plaintiffs' claims for payments in those years for which payments [were] sought before fiscal year 1995 and after fiscal year 2001" in the case of Tunica and before fiscal year 1993 and after fiscal year 1996 with respect to Ramah Navajo because those claims had not been presented properly to the IHS as required by the CDA. Id. at 15.[8] But the Court refused to dismiss the plaintiffs' claims in their entirety as moot notwithstanding the defendants' contention that they no longer had any appropriated funds from which the plaintiffs' claims could be satisfied due to the lack of any evidence to support the defendants' argument, id. at 18-26, and declined to rule on whether Tunica had standing to seek any relief with respect to fiscal years after 1996 without further briefing, id. at 29, although it noted that it was "clear . . . that [the] plaintiffs have standing to challenge the indirect [contract support costs] they received for fiscal years 1995 and 1996," id. at 28.

In addition, the Court rejected the defendants' argument that the plaintiffs' claims were time-barred by the statute of limitations set forth in 28 U.S.C. § 2401(a), Tunica-Biloxi, slip op. at 29-30, as well as their assertion that the United States should be dismissed as a party to this case under the doctrine of sovereign immunity, id. at 30-36. However, the Court agreed with

that motion in an order entered on May 6, 2003. The plaintiffs subsequently renewed their motion for class certification on March 23, 2006, but withdrew the motion on May 22, 2006.

[8] The Court reached the opposite result with respect to the defendants' argument that the plaintiffs' claims for breach of the implied covenant of good faith and fair dealing were also barred by the exhaustion doctrine, reasoning that they were simply alternative legal theories of recovery and thus "did not have to be presented to the contracting officer [(i.e., the IHS)]." Id. at 15-16. Nevertheless, the Court dismissed these claims for other reasons. See infra discussion.

the defendants that the Interim Director of the IHS, the Inspector General of the OIG, and the Director of the National Business Center should all be dismissed from the case because "[t]he Court [did] not think" that "the [Indian Self-Determination Act] grant[ed] the Court jurisdiction over any named federal official based on the United States'[s] waiver of sovereign immunity," id. at 36 (emphasis in original), and "[t]hese individually named defendants [were] merely agents of the Secretar[ies] and [the] plaintiffs would not be entitled to any greater relief by the inclusion of these defendants in [the plaintiffs'] lawsuit," id. at 36-37.  Finally, the Court held that the plaintiffs could not state viable claims for breach of a fiduciary duty or breach of the implied covenant of good faith and fair dealing and that these claims should therefore be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  Id. at 37-40.

In response to the parties' joint request, the Court entered an order on June 10, 2004, staying this case until the Supreme Court could resolve certain related cases before it.  That order was vacated on November 7, 2005, after which the defendants filed a motion to dismiss the plaintiffs' second amended complaint in its entirety, Defendants' Motion to Dismiss at 1, and the plaintiffs filed a motion for summary judgment with respect to its claims for those years in which Congress appropriated funds to the Department of Health and Human Services in a lump sum, Motion for Partial Summary Judgment as to ["]Lump Sum Years["] (1995-1997) at 1-2, to which the defendants eventually responded by filing both an opposition and a cross-motion for summary judgment, Defendants' Cross-Motion for Summary Judgment at 1.  Due to the need for discovery to resolve these motions, the Court set forth a schedule for discovery pursuant to Federal Rule of Civil Procedure 56(f), denied the parties' motions without prejudice, and set a briefing schedule for renewed motions on June 5, 2006.

While its lawsuit proceeded apace before this Court, Ramah Navajo filed new Shortfall and Rate Dilution Claims for fiscal year 1998 with the IHS in a letter prepared in late 2003. Defs.' Ex. 28 (Letter from Jim Hooper, Jr., Executive Director, Ramah Navajo School Board, Inc., to Diego Lujan, Director, Division of Contracts & Grants, Albuquerque Area Indian Health Service (Dec. 30, 2003)) (the "Supplemental Ramah Navajo CDA Claim") at 1-4. It subsequently issued yet another letter on September 21, 2005, in which it reiterated its Shortfall and Rate Dilution Claims for fiscal years 1999-2003 and also raised Carry-Forward Claims for these fiscal years. Defs.' Ex. 29 (Letter from Bennie Cohoe, Interim Executive Director, Ramah Navajo Board of Trustees, to Diego G. Lujan, Director, Office of Contracts & Grants, Albuquerque Area Indian Health Service (Sept. 21, 2005)) (the "Second Supplemental Ramah Navajo CDA Claim") at 1-2.[9] When the IHS did not act on these claims in a timely manner, Ramah Navajo filed a supplemental complaint with this Court adding these claims pursuant to Federal Rule of Civil Procedure 15(d). Supplemental Complaint (the "Suppl. Compl.") ¶¶ 3-5.

After Ramah Navajo filed its supplemental complaint and the parties completed discovery, the plaintiffs renewed their motion for partial summary judgment on December 21, 2006, Plaintiffs' Motion for Partial Summary Judgment at 1, while the defendants filed a motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted or for summary judgment that same day, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment at 1. After the close of briefing on those motions, the

---

[9]  Ramah Navajo's claims for 1998 and 1999 arise from a self-determination contract effective in 1997 with Annual Funding Agreements covering the period from 1997 to 1999. Defs.' Ex. 10 (Self-Determination Contract between Ramah Navajo and the IHS effective January 1, 1997) at 1-127. Its claims for 2000-2002 arise from a self-determination contract effective in 2000 with annual funding agreements covering the period from 2000 to 2002. Defs.' Ex. 11 (Self-Determination Contract between Ramah Navajo and the IHS effective January 1, 2000) at 1-152. Its claim for 2003 arises from a self-determination contract effective in 2003 and an accompanying annual funding agreement for that same year. Defs.' Ex. 12 (Self-Determination Contract between Ramah Navajo and the IHS effective January 1, 2003) at 1-78.

parties filed numerous supplemental notices of authority, supplemental declarations, and new exhibits, along with other miscellaneous documents.  This bevy of supplemental filings led the Court to enter an order on March 17, 2008, denying both motions without prejudice and a separate order on March 28, 2007, setting a forth a revised (and more structured) briefing schedule so as to simplify the record before the Court upon which the parties' motions would be addressed as much as possible.

Pursuant to the Court's revised scheduling order, the defendants filed a renewed dispositive motion on April 20, 2008.  In their renewed motion, the defendants seek to dismiss some of the plaintiffs' claims—including all claims against Secretary Kempthorne—for lack of subject-matter jurisdiction and seek summary judgment with respect to the remainder of the plaintiffs' claims. Defs.' Mem. at 1-2.  With respect to subject-matter jurisdiction, the defendants argue that the plaintiffs' claims against Secretary Kempthorne are moot because the plaintiffs do not seek any actionable relief against him, id. at 20-21, and in any event must be dismissed due to the defendants' failure to exhaust the administrative remedies available to them, id. at 21-22.  They further argue that Ramah Navajo's claims for fiscal years 1997-2003 must be dismissed because it did not present any claim for fiscal year 1997 to the IHS, did not present its Carry-Forward Claim to the IHS for fiscal year 1998, and did not adequately present any of its claims to the IHS for fiscal years 1998-2003. Id. at 17-18.[10]

The defendants' arguments in support of summary judgment are more complex.  They argue that summary judgment should be granted in their favor because the IHS fully complied

---

[10]   The defendants also argue at length that the Court should dismiss the plaintiffs' Shortfall Claims for lack of standing, see Defs.' Mem. at 18-20 ("[The p]laintiffs lack standing as to their [S]hortfall [C]laims."); Defs.' Reply/Cross Opp'n at 7-8 ("[The p]laintiffs lack standing to assert . . . the [Shortfall Claims] because [the] IHS paid both [p]laintiffs more than their direct cost base multiplied by their rate in all years.").  As the plaintiffs readily admit, however, these claims are not raised in the second amended complaint, and therefore are not before the Court in the first instance. See Pls.' Mem. at 31 ("[The d]efendants' standing argument directed to the [Shortfall Claims] is irrelevant because the operative pleadings allege no [Shortfall Claim].").

with the terms of its self-determination contracts with the plaintiffs, including the funding levels

agreed to by the plaintiffs, id. at 22-25, and that these contracts do not violate the Indian Self-

Determination Act because the Act does not require a specific amount of funding for indirect

costs, but rather contemplates negotiation of the appropriate amount of funding by the parties, id.

at 25-29.  They further argue that the plaintiffs have waived any claims that they might have

been able to assert under the Indian Self-Determination Act or should be estopped from asserting

such claims by agreeing to and accepting performance under the self-determination contracts

negotiated with the IHS instead of forcing the Secretary for the Department of Health and

Human Services to decline their own proposed contracts with higher rates and appealing that

declination through the agency appeals process or directly in federal district court.  Id. at 52-59.

The defendants also argue that summary judgment in their favor is appropriate with respect to all

of the plaintiffs' claims because the plaintiffs actually recovered more indirect costs from the

IHS than they actually expended, and any additional amounts awarded to the plaintiffs would

result in a windfall.  Id. at 59-60.  Finally, they contend that, at a minimum, the Court should

grant summary judgment in their favor with respect to the plaintiffs' Rate Dilution Claims

because the Indian Self-Determination Act permits, and, indeed, mandates, the methodology

used by the OIG and the National Business Center to calculate indirect cost rates, id. at 38-52,

and with respect to all of the plaintiffs' claims for fiscal years after 1997 because Congress

specifically limited its appropriations to the Department of Health and Human Services

beginning in fiscal year 1998, id. at 29-31.

  The plaintiffs strenuously object to the notion that their claims for fiscal years 1998-2003

were not adequately presented to the IHS, including Ramah Navajo's Carry-Forward Claim for

fiscal year 1998.  Pls.' Mem. at 27-31.[11]  They argue that their claims against Secretary

Kempthorne are justiciable because the Court can award injunctive relief in their favor.  Id. at

32-33.  Further, they assert that they are not required to exhaust any administrative remedies

available to them with respect to those claims because they have already exhausted the

administrative remedies provided by the CDA and it would be futile to appeal the OIG's and

National Business Center's methodology within the Department of the Interior.  Id. at 33-34.

With respect to the defendants' arguments in support of their request for partial summary

judgment, the defendants contend that the Indian Self-Determination Act requires full funding of

all contract support costs, including indirect costs, for every self-determination contract, id. at

47-48, and that the contract price for their self-determination contracts necessarily included the

full amount of funding necessary to cover those costs, id. at 12-14.  They further argue that the

Indian Self-Determination Act does not require that the IHS adhere to the methodology set forth

in OMB Circular A-87, id. at 44-46, that applying that methodology to self-determination

contracts violates the Indian Self-Determination Act because it does not provide for full funding

of a tribe or tribal authority's indirect costs, id. at 46-47, and that the defendants are collaterally

estopped from arguing otherwise by the Tenth Circuit's decision in RNC, id. at 15-22.  The

plaintiffs also dispute the defendants' waiver and estoppel arguments, asserting that these

arguments are procedurally infirm, id. at 53-56, that the plaintiffs could not waive their rights

under the Indian Self-Determination Act, id. at 56-61, and that they have not waived their rights

or engaged in conduct warranting estoppel of their claims in any event, id. at 61-64.  They

---

[11]  The plaintiffs do not contest the defendants' assertion that Ramah Navajo failed to present any claims for fiscal year 1997 in their consolidated memorandum of law in opposition to the defendants' dispositive motion and in support of their cross-motion for summary judgment.  See id. at 27-31 (discussing only the sufficiency of the presentation of Ramah Navajo's presentation of claims for fiscal years 1998-2003).  However, they state in their cross-reply memorandum that "[t]he time for presenting [Ramah Navajo's] individual claims for 1997 was tolled until class certification was denied in Pueblo of Zuni v. United States, [243 F.R.D. 436 (D.N.M. 2007)]."  Pls.' Cross-Reply at 3.

dismiss the defendants' reliance on <u>Samish Indian Nation v. United States</u>, 419 F.3d 1355 (Fed.

Cir. 2005), as support for their "windfall" argument as "misplaced," Pls.' Mem. at 64, and argue

that the carry-forward methodology used by the DOI and accepted by the IHS improperly

reduces the amount of indirect cost funding provided by the IHS in future years, thereby

violating the terms of the plaintiffs' self-determination contracts and the Indian Self-

Determination Act, <u>id.</u> at 22-25.

The plaintiffs also argue extensively that the limitations placed on the appropriations

provided by Congress to the Secretary of Health and Human Services to fund self-determination

contracts for fiscal years after 1997 do not excuse the IHS's obligations under the Indian Self-

Determination Act.   First, they contend that the Secretary is bound by his contractual obligations

regardless of whether funds are actually available to satisfy those obligations.  <u>Id.</u> at 35-40.

Second, they assert that the provision in the Indian Self-Determination Act making the

Secretary's funding obligations "subject to the availability of appropriations," 25 U.S.C.

§ 450j(c)(1), applies "only to the out-years of multi-year or indefinite term contracts," not the

contracts at issue here. Pls.' Mem. at 40 (emphasis removed).  Third, they argue that even

"capped" appropriations from Congress are subject to the "lump sum" rule announced in

<u>Cherokee Nation of Oklahoma v. Leavitt</u>, 543 U.S. 631 (2005), which held that the Secretary is

liable for any contractual obligations where the "lump sum" of the funds appropriated by

Congress would cover the specific obligation at issue even if the funds would not cover all of the

obligations undertaken by the Secretary, Pls.' Mem. at 41-43.  Finally, they contend that the

Secretary's failure to request sufficient funding to cover his contractual obligations negates any

defense he might otherwise assert based on the inadequate level of funding appropriated to him

by Congress.  <u>Id.</u> at 43.  The plaintiffs argue not only that summary judgment in the defendants'

favor is inappropriate with respect to those fiscal years where appropriations were "capped" by Congress, but that summary judgment should be entered in their favor for those fiscal years where Congress appropriated money in a "lump sum" to the Secretary, id. at 14.

In their combined reply memorandum in support of their dispositive motion and opposition to the plaintiffs' cross-motion for partial summary judgment, the defendants reiterate their jurisdictional arguments, Defs.' Reply/Cross-Opp'n at 3-8, and seek to dismiss additional arguments raised by the plaintiffs in their opposition and cross-motion in support of their Carry-Forward Claims for failure to exhaust administrative remedies, id. at 3-4. The defendants dispute the preclusive effects of the Tenth Circuit's ruling in RNC, id. at 11-20, and argue that neither their self-determination contracts nor the Indian Self-Determination Act itself requires any funding for indirect costs in addition those amounts negotiated by the parties, id. at 8-11, or the adoption of any particular methodology for the calculation of such funding, id. at 20-26. They renew their waiver, estoppel, and "windfall" arguments, id. at 26-29, and assert that "[w]hile there is a general trust relationship between the Indian people and the United States, . . . this relationship is not actionable," id. at 29. Finally, they contend that by seeking summary judgment only with respect to their claims for fiscal years in which Congress appropriated funds to the Secretary of Health and Human Services in a lump sum, the plaintiffs have essentially conceded that their claims for fiscal years where congressional appropriations were "capped" are "legally baseless." Id. at 30.

The plaintiffs devote much of their cross-reply memorandum to their collateral estoppel argument, Pls.' Cross-Reply at 7-12, as well as to their arguments regarding the need for full funding of indirect costs and the use of a different methodology to determine the amount of those costs under the Indian Self-Determination Act and the parties' contracts, id. at 5-7, 12-14. They

revisit their earlier arguments concerning subject-matter jurisdiction, id. at 2-5,  and waiver and

estoppel, id. at 14, and once again argue that they will not receive any "windfall" should they

succeed on their claims, id. at 15.  Finally, they describe the defendants' contention that they

have conceded the baseless nature of their claims for "lump sum" years as "the silliest argument

of all," and opine that "[t]he bureaucratic resistance to Indian self-determination and the panoply

of insupportable and overbroad defenses in this litigation demonstrate just how far

[the d]efendants have strayed from their trust duties."  Id. at 15.

## II. Standard of Review

As the Court noted previously, the defendants seek dismissal of some of the plaintiffs'

claims under Federal Rule of Civil Procedure 12(b)(1), while both sides seek summary judgment

pursuant to Federal Rule of Civil Procedure 56.  Further, the Court's analysis below implicates

dismissal not only under Rule 12(b)(1), but also under Federal Rule of Civil Procedure 12(b)(6).

The Court therefore addresses the applicable standard for each of these three rules.

A.      Motion to Dismiss under Rule 12(b)(1)

Broadly speaking, there are two types of Rule 12(b)(1) motions.  "A facial challenge

attacks the factual allegations of the complaint that are contained on the face of the complaint,

while a factual challenge is addressed to the underlying facts contained in the complaint."  Al-

Owhali v. Ashcroft, 279 F. Supp. 2d 13, 20 (D.D.C. 2003) (internal quotation and citations

omitted).  Where a defendant makes a facial challenge, "the [district] court must accept as true

the allegations in the complaint and consider the factual allegations of the complaint in the light

most favorable to the non-moving party," Erby v. United States, 424 F. Supp. 2d 180, 182

(D.D.C. 2006), just as it would on a motion to dismiss under Federal Rule of Civil Procedure

12(b)(6), see Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 93 (D.C. Cir.

2002) (noting that the standard for facial challenge to subject-matter jurisdiction "is similar to that of Rule 12(b)(6)").  On the other hand, where a factual challenge is made, a district court "may consider materials outside the pleadings" to determine whether it has subject-matter jurisdiction over the challenged case or claims, Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005), and "the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence," Erby, 424 F. Supp. 2d at 182.

B.      Motion to Dismiss under Rule 12(b)(6)

        As with facial challenges to subject-matter jurisdiction under Rule 12(b)(1), the Court "must treat the complaint's factual allegations as true and must grant [the] plaintiff the benefit of all reasonable inferences from the facts alleged" in considering motions to dismiss under Rule 12(b)(6).  Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (internal quotations omitted). Unlike motions to dismiss under Rule 12(b)(1), factual challenges are not permitted under Rule 12(b)(6), and the Court may only consider the facts alleged in the complaint, any documents attached as exhibits thereto, and matters subject to judicial notice in weighing the merits of the motion.  EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997).  The Court's focus is therefore restricted to the facts as alleged by the plaintiff, which must be sufficiently detailed "to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, ___ U.S. ___, 127 S. Ct. 1955, 1965 (2007).

C.      Motion for Summary Judgment under Rule 56

        Under Rule 56, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  When ruling on a Rule 56 motion, the Court must view the evidence in the light

most favorable to the non-moving party.  Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir.

2006) (citing Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 150 (2000)).  The Court must

also draw "all justifiable inferences" in the non-moving party's favor and accept the non-moving

party's evidence as true.  Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986).  The non-

moving party, however, cannot rely on "mere allegations or denials," Burke v. Gould, 286 F.3d

513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248) (internal quotation and citation

omitted), for "conclusory allegations unsupported by factual data will not create a triable issue of

fact."  Pub. Citizen Health Research Group v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal

quotation and citation omitted).  If the Court concludes that "the non-moving party has failed to

make a sufficient showing on an essential element of [its] case with respect to which [it] has the

burden of proof," then the moving party is entitled to summary judgment.  Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).

### III. Legal Analysis

Based upon the positions taken by the parties in their respective memoranda of law, the

issues before the Court are roughly segregable into two categories: issues implicating the Court's

subject-matter jurisdiction to consider certain claims raised by the plaintiffs, and issues

concerning the legal obligations imposed upon the defendants by their self-determination

contracts with the plaintiffs and by the Indian Self-Determination Act.  Because "[j]urisdiction

must be established before a federal court may proceed to any other question," Galvan v. Fed.

Prison Indus., Inc., 199 F.3d 461, 463 (D.C. Cir. 1999), the Court will begin its analysis with the

question of subject-matter jurisdiction before proceeding to the merits of the parties' claims

concerning the Indian Self-Determination Act and the terms of their self-determination contracts.

A.      Subject-Matter Jurisdiction

        Just as there are generally two categories of issues before Court overall, so too can the

issues before the Court concerning subject-matter jurisdiction be divided into two groups: those

issues concerning the Court's subject-matter jurisdiction over Secretary Kempthorne, and those

issues relating to the presentment of the plaintiffs' claims to the IHS in accordance with the

requirements of the CDA.  The Court considers each category of issues in turn.

        1.      The Claims Against Secretary Kempthorne

        The defendants make two arguments with respect to Secretary Kempthorne: (1) that the

plaintiffs' claims are moot because they cannot "yield any monetary relief," Defs.' Mem. at 20,

and (2) that the plaintiffs' claims against Secretary Kempthorne must be dismissed because "they

failed to exhaust their administrative remedies," id. at 21.  The former argument is properly

designated as one implicating the Court's subject-matter jurisdiction.  See Southern Co. Servs.,

Inc. v. FERC, 416 F.3d 39, 43 (D.C. Cir. 2005) (describing "the question of mootness" as "a

threshold jurisdictional issue" (internal quotation and citation omitted)).  The latter argument is

not.  See Lindsey v. United States, 448 F. Supp. 2d 37, 50-54 (D.D.C. 2006) (Walton, J.) ("Only

where a statute contains sweeping and direct statutory language indicating that there is no federal

jurisdiction prior to exhaustion may courts conclude that a particular exhaustion requirement is

jurisdictional." (internal quotation and citation omitted)).  The Court considers both of these

issues below.

        a.      Justiciability

        "No principle is more fundamental to the judiciary's proper role in our system of

government than the constitutional limitation of federal-court jurisdiction to actual cases or

controversies."  Raines v. Byrd, 521 U.S. 811, 818 (1997) (internal quotation and citation

omitted).  "That restriction requires that the party invoking federal jurisdiction have standing—

the personal interest that must exist at the commencement of the litigation."  Davis v. FEC, ___

U.S. ___, ___, 128 S. Ct. 2759, 2768 (2008) (internal quotation and citation omitted).  "The

requisite elements of Article III standing are well established: [a] plaintiff must allege personal

injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by

the requested relief."  Hein v. Freedom from Religion Found., Inc., ___ U.S. ___, ___, 127 S. Ct.

2553, 2562 (2007) (internal quotation and citation omitted).

 Closely related to the concept of standing is that of mootness, which "denies federal

courts the power to decide questions that cannot affect the rights of litigants in the case before

them," Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990) (internal quotation and citation

omitted), by "forbid[ding] federal courts from rendering advisory opinions," Hall v. CIA, 437

F.3d 94, 99 (D.C. Cir. 2006) (internal quotation and citation omitted), where it would be

"impossible for the court to grant any effectual relief whatever," Church of Scientology of Cal. v.

United States, 506 U.S. 9, 12 (1992) (internal quotation and citation omitted).  "A case is moot if

the judgment, regardless of which way it goes, will neither presently affect the parties' rights nor

have a more-than-speculative chance of affecting them in the future," Noble v. Sombrotto, 525

F.3d 1230, 1241 (D.C. Cir. 2008) (internal quotation and citation omitted); i.e., "when the issues

presented are no longer live or the parties lack a legally cognizable interest in the outcome,"

County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979).  The mootness doctrine is distinct

from that of standing only in that "the standing inquiry remains focused on whether the party

invoking jurisdiction had the requisite stake in the outcome when the suit was filed," Davis, ___

U.S. at ___, 128 S. Ct. at 2769, whereas "[a] court determines whether a case is moot at the time

of review and not at the time of filing," <u>Mogu v. Chertoff</u>, 550 F. Supp. 2d 107, 110 n.5 (D.D.C.

2008).

The defendants argue that the DOI's "sole function" insofar as this lawsuit is concerned

"was to negotiate and approve indirect cost rates," and that consequently "the most that the Court

could order pursuant to such a claim [would be] that [the] DOI recalculate [the p]laintiff's out-

of-date rates," which would have "no practical effect."  Defs.' Mem. at 20.  This argument

suggests that the plaintiffs' claims could not give rise to any relief as of the date of plaintiffs'

initial complaint, not due to some event that occurred subsequent to that filing.  In other words,

the defendants have mislabeled their argument as one in favor of a finding of mootness when the

argument actually concerns the plaintiffs' lack of standing due to the absence of redressability

for their claims against Secretary Kempthorne in the first instance.

Because "[t]he [Article] III judicial power exists only to redress or otherwise to protect

against injury to the complaining party," <u>Warth v. Seldin</u>, 422 U.S. 490, 499 (1975), "[a] lawsuit

does not fall within" a court's "grant of judicial authority unless, among other things, [the]

court[] ha[s] the power to redress the injury that the defendant allegedly caused the plaintiff."

<u>Utah v. Evans</u>, 536 U.S. 452, 459 (2002) (internal quotation and citation omitted).

Redressability is "theoretically distinct" from the separate standing requirement of causation: the

former "tests the relationship between the injury and the requested relief," whereas the latter

"looks at the relationship between the alleged unlawful conduct and the injury."  <u>Mideast Sys.</u>

<u>and China Civil Constr. Saipan Joint Venture, Inc. v. Hodel</u>, 792 F.2d 1172, 1176 (D.C. Cir.

1986).  Specifically, the alleged injury must be of the type that is "traditionally thought to be

capable of resolution through the judicial process" to be redressable.  <u>Flast v. Cohen</u>, 392 U.S.

83, 97 (1968).  Thus, to establish redressability, a plaintiff must demonstrate that there is "a

substantial likelihood that the requested relief will remedy the alleged injury in fact." Vt.

Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000) (internal

quotation and citation omitted).

The Court agrees with the defendants that it would be pointless to review the merits of

the DOI's work with respect to the self-determination contracts already executed between the

parties. Even if the Court were to compel Secretary Kempthorne to recalculate the plaintiffs'

indirect cost rates using the methodology preferred by the plaintiffs, this recalculation would not

benefit the plaintiffs in the slightest unless the Court also granted relief against Secretary Leavitt

because Secretary Kempthorne is not obliged to fund the plaintiffs' indirect cost requirements

under the Indian Self-Determination Act or the terms of the plaintiffs' self-determination

contracts. See 25 U.S.C. § 450j-1(a) (delineating "[t]he [minimum] amount of funds [that must

be] provided under the terms of self-determination contracts" (emphasis added)); id. § 450b(j)

(defining a self-determination contract as a "contract . . . entered into . . . between a tribal

organization and the appropriate Secretary for the planning, conduct[,] and administration of

programs or services which are otherwise provided to Indian tribes and their members pursuant

to Federal law" (emphasis added)); see also Defs.' Ex. 7 (Self-Determination Contract between

Tunica and the IHS effective January 1, 1996) at 5 (specifying that the contract in question "is

entered into by the Secretary of the Department of Health and Human Services . . . and . . . the

Tunica-Biloxi Tribe"); Defs.' Ex. 8 (Self-Determination Contract between Tunica and the IHS

effective April 1, 2000) at 5 (same); Defs.' Ex. 9 (Self-Determination Contract between Ramah

Navajo and the IHS effective September 21, 1988) at 30 (modifying the contract by, inter alia,

clarifying that the contract "is entered into by the Secretary of Health and Human

Services . . . and . . . the Ramah Navajo School Board, Inc."); Defs.' Ex. 10 (Self-Determination

Contract between Ramah Navajo and the IHS effective January 1, 1997) at 7 (specifying that the contract in question "is entered into by the Secretary of Health and Human Services . . . and . . . the Ramah Navajo School Board, Inc."); Defs.' Ex. 11 (Self-Determination Contract between Ramah Navajo and the IHS effective January 1, 2000) at 7 (same); Defs.' Ex. 12 (Self-Determination Contract between Ramah Navajo and the IHS effective January 1, 2003) at 6 (same); see also Defs.' Ex. 3 (Declaration of Deborah A. Moberly dated April 11, 2008) (the "Moberly Decl.") ¶ 4 (stating under oath that the "Indirect Cost Services" division of the National Business Center "does not make or fund [self-determination] contracts"); Pls.' Ex. 11 (September 13, 2006 Deposition of Deborah Moberly) at 39:15-17 ("[W]e are only involved in negotiating the rate.  We don't get involved in the funding . . . ."); id. at 65:24-66:1 ("[W]e negotiate the rates with the entities and it's then between them and their funding agencies on the recoveries.").  Conversely, if the Court were to order Secretary Leavitt to pay the difference between the indirect costs actually funded by the IHS and the indirect cost figures arising from the plaintiffs' indirect cost rate methodology, there would be no need for the Court to order Secretary Kempthorne to do anything because the plaintiffs would be fully recompensed even by their own definition.  In short, the plaintiffs can obtain the monetary relief they seek only from Secretary Leavitt, the satisfaction of which would make any proceedings against Secretary Kempthorne for those same damages unnecessary.

However, "[s]tanding is not dispensed in gross," Davis, ___ U.S. at ___, 128 S. Ct. at 2769 (internal quotation and citation omitted), and the relief requested by the plaintiffs in their second amended complaint transcends monetary damages for breach of contract.  They also ask "[t]hat the Court adjudge the methods employed by the [d]efendants for computing and paying each [plaintiff's] entitlement to [i]ndirect [c]ontract [s]upport [c]osts to be in violation of the

governing statutes and in breach of contract <u>and issue an injunction accordingly</u>."  Complaint at

15 (emphasis added).  In other words, the plaintiffs seek not only to be made whole for the harm

they have already allegedly suffered, but also to "to reform the conduct of [the d]efendants in the

future."  Pls.' Cross-Reply at 4.

In this respect, there is a "substantial likelihood" that injunctive relief against Secretary

Kempthorne would "remedy" the prospective harm identified by the plaintiffs.  <u>Stevens</u>, 529

U.S. at 771 (internal quotation and citation omitted).  The IHS has made it abundantly clear that

it "usually" relies on the DOI to set the indirect cost rates that are used to calculate funding for

indirect costs in self-determination contracts, Pls.' Ex. 18 (IHS Policy Statements on Contract

Support Costs) (the "IHS Policy Statements") at 18, including those applied to the plaintiffs in

the past, Defs.' Facts ¶¶ 10, 16, 22, 28, 34, 40, 46, 56, 62, 68, 74, 80, 86, 92, 98, 104; <u>see also,</u>

<u>e.g.</u>, IHS Policy Statements at 3 (defining indirect costs as "[c]osts . . . which[, <u>inter</u> <u>alia</u>], are not

funded by other direct costs[] and are incorporated in the Indian tribe's or tribal organization's

indirect reimbursement procedure as negotiated annually with the cognizant [f]ederal agency");

<u>id.</u> at 13 ("The amount of [indirect costs] expected to be incurred by awardees utilizing rates

negotiated with the cognizant [f]ederal agency[] will be determined by applying the negotiated

rate(s) to the appropriate direct cost base amount . . . ."); <u>id.</u> at 19 (same); <u>id.</u> at 24 (same); <u>id.</u> at

31 (same); Pls.' Ex. 21 (IHS Justifications of Estimates for Appropriations Committees) at 3

("Negotiation of indirect cost[] need[s] for tribal contractors is performed between the contractor

and the Inspector General of the cognizant agency."); <u>id.</u> at 6 (same); <u>id.</u> at 10 (same).  As

Douglas Black, "the director of the office that deals with contract support cost policy" at the IHS,

Pls.' Ex. 24 (August 24, 2006 Deposition of Douglas Black) (the "Black Dep.") at 7:22-8:2,

testified at his deposition in this case, indirect costs

> [A]re generally paid on rates that are negotiated between tribes and tribal organizations with either the National Business Center or[,] in some few cases[,] the—our cost allocation office and the Department of Health and Human Services.  And in even fewer cases—and this would be a minimal number[,] I would believe—we, on occasion, will sit down with a tribe and negotiate indirect-type or like costs.

Id. at 8:16-9:3.

Given this practice by the IHS, it stands to reason that any prospective injunctive relief entered against Secretary Kempthorne would affect the funding of future self-determination contracts entered into by the plaintiffs because the IHS would rely upon the modified calculations performed by the DOI to fund the indirect cost component of those agreements.  The Court could therefore "redress the injury that [Secretary Kempthorne would] allegedly cause[] the plaintiff[s]" in the future by ordering prospective injunctive relief, Evans, 536 U.S. at 459 (internal quotation and citation omitted), providing the plaintiffs with standing to seek such relief against him.

                    b.       Exhaustion of administrative remedies

OMB Circular A-87 specifies that "[i]f a dispute arises in a negotiation of an indirect cost rate . . . between the cognizant agency and the governmental unit [or, in this case, the tribe or tribal authority], the dispute shall be resolved in accordance with the appeals procedures of the cognizant agency."  2 C.F.R. § 225 app. E(F)(4).  Appeals from decisions by the DOI are governed by a comprehensive set of regulations, which are memorialized at Part 4 of Title 43 to the Code of Federal Regulations.  See 43 C.F.R. §§ 4.1-4.1610 (2007) (setting forth the rules and regulations governing appeals from DOI actions).  By all accounts, the plaintiffs did not pursue the remedies set forth in those regulations before filing suit against Secretary Kempthorne in this Court.  See Defs.' Mem. at 21 ("In each year that [the p]laintiffs negotiated and executed indirect

cost rate agreements[,] . . . they failed to utilize the administrative procedure[s set forth in Title 43, Part 4.]"); Pls.' Mem. at 33 (arguing solely that the plaintiffs were not required to exhaust their administrative remedies, not that they have actually exhausted them); Defs.' Reply/Cross-Opp'n at 8 ("[The p]laintiffs admit that they did not exhaust [their] claims [against Secretary Kempthorne], . . . but simply state that they need not have done so.").  Thus, the issue before the Court is whether the plaintiffs' failure to exhaust their administrative remedies in regards to appealing the actions of the DOI requires dismissal of their claims against Secretary Kempthorne.

i.    <u>Procedural framework</u>

As an initial matter, the defendants incorrectly suggest that a plaintiff's failure to exhaust its administrative remedies necessarily implicates a court's subject-matter jurisdiction.  "The word 'exhaustion' now describes two distinct legal concepts."  <u>Avocados Plus Inc. v. Veneman</u>, 370 F.3d 1243, 1247 (D.C. Cir. 2004).  The first "is a judicially created doctrine requiring parties who seek to challenge agency action to exhaust available administrative remedies before bringing their case to court," whereas "[t]he second form of exhaustion arises when Congress requires resort to the administrative process as a predicate to judicial review."  <u>Id.</u>  Only the latter concept is jurisdictional in nature.  <u>See id.</u> (explaining that so-called "jurisdictional exhaustion" is "rooted . . . in Congress' power to control the jurisdiction of the federal courts").  Moreover, a district court must "presume [that] exhaustion is non-jurisdictional unless Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision."  <u>Id.</u> at 1248 (internal quotation and citation omitted).

Nothing in the Indian Self-Determination Act or, to this Court's knowledge, any other applicable statute explicitly requires that a party to a self-determination contract must exhaust the internal remedies provided by its cognizant agency before invoking this Court's subject-matter jurisdiction.  To the contrary, the Indian Self-Determination Act excuses the exhaustion requirement in the context of secretarial declinations, 25 U.S.C. § 450f(b)(3), and requires only that a contracting party adhere to the procedures set forth in the CDA before filing suit in federal court for contractual damages, id. § 450m-1(d).  Because there is no "sweeping and direct statutory language indicating that there is no federal jurisdiction prior to exhaustion," the "presum[ption] [that] exhaustion is non-jurisdictional" applies in this case.  Avocados Plus, 370 F.3d at 1248 (internal quotation and citation omitted).  And because the doctrine of exhaustion applicable to this case is non-jurisdictional in nature, the Court cannot decide whether the doctrine requires dismissal of the plaintiffs' claims against Secretary Kempthorne on a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1).

"Instead, the only possible procedural mechanism for considering the government's statute of limitations argument at this stage of the proceedings is Rule 12(b)(6)."  Smith v. United States, 518 F. Supp. 2d 139, 149 (D.D.C. 2007) (Walton, J.).  "But there are important differences between motions to dismiss made pursuant to these two rules, chief among them the limitation of the scope of the Court's inquiry on a Rule 12(b)(6) motion to the facts alleged in (or documents incorporated by) a plaintiff's complaint."  Shane v. United States, Civil Action No. 07-577 (RBW), 2008 WL 101739, at *6 (D.D.C. Jan. 9, 2008) (Walton, J.) (citing  EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624-25 (D.C. Cir. 1997)) (further internal quotation and citation omitted).  "One consequence of this limitation is that a defendant may raise an affirmative defense (such as exhaustion of administrative remedies) under Rule 12(b)(6) only

'when the facts that give rise to the defense are clear from the face of the complaint.'" Id.

(quoting Smith-Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998)); see also

Jones v. Bock, 549 U.S. 199, ___, 127 S. Ct. 910, 919 (2007) (noting that "the usual practice

under the Federal Rules [of Civil Procedure] is to regard exhaustion as an affirmative defense").

 The plaintiffs' second amended complaint is silent with respect to the issue of exhaustion

of administrative remedies, foreclosing dismissal under Rule 12(b)(6).  See Jones, 549 U.S. at

___, 127 S. Ct. at 921 (holding that where "failure to exhaust is an affirmative defense,"

plaintiffs "are not required to specially plead or demonstrate exhaustion in their complaints").

However, the plaintiffs do not dispute that they failed to pursue such remedies.  Compare Defs.'

Facts ¶ 6 (stating that "Tunica did not challenge its 1995-2001 indirect cost rates through [the]

DOI's appeals process") and id. ¶ 7 (making the same assertion with respect to Ramah Navajo's

indirect cost rates for 1995-2003) with Pls.' Resp. ¶ G (noting these assertions, but arguing only

that exhaustion of those remedies is not required).  This admission is supported by the

evidentiary record, which is also undisputed.  See Moberly Decl.  ¶¶ 45-46 (noting that "[t]here

is no evidence" in the National Business Center's files that either of the plaintiffs utilized the

DOI's internal appeals process); Defs.' Ex. 38 (Plaintiffs' Answers to Second Set of Requests for

Admission) at 5, 7-9 (admitting that the plaintiffs did not pursue the DOI's administrative

appeals procedure to dispute the methodology used by the DOI to calculate an indirect cost rate

for calendar years 1995 and 1996).

 "[W]hen a district court is not sitting as an appellate court and the district judge looks

outside the complaint to factual matters, he or she must convert a motion to dismiss into a motion

for summary judgment[.]"  Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1226

(D.C. Cir. 1993).  And ordinarily, a district court facing such circumstances "must allow all

parties both a reasonable opportunity to present all material made pertinent to such a motion by Rule 56 and a chance to pursue reasonable discovery." Taylor v. FDIC, 132 F.3d 753, 765 (D.C. Cir. 1997) (internal quotation and citation omitted).  "However, such notice need not be given where the court is satisfied that the parties are not taken by surprise or deprived of a reasonable opportunity to contest facts averred outside the pleadings and the issues involved are discrete and dispositive."  Smith, 518 F. Supp. 2d at 154 (internal quotation and citation omitted); see also Kennedy v. Empire Blue Cross and Blue Shield, 989 F.2d 588, 592 (2d Cir. 1993) (finding no error in district court's conversion of motion to dismiss under Rule 12(b)(6) to motion for summary judgment without prior notice to parties where both parties submitted evidence in support of their positions).

For example, in Smith the defendant filed a motion to dismiss the plaintiff's suit brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1291, 1346, 1402, 2401-02, 2411-12, 2671-80 (2000) (the "FTCA"), for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), arguing, inter alia, that the plaintiff's claims were barred by the applicable statute of limitations.  Smith, 518 F. Supp. 2d at 142-44.  Applying the Supreme Court's rulings in Day v. McDonough, 547 U.S. 198 (2006), and Irwin v. Dep't of Veterans Affairs, 498 U.S. 89 (1990), as well as the Court's prior decision in P & V Enters. v. U.S. Army Corps of Eng'rs, 466 F. Supp. 2d 134 (D.D.C. 2006) (Walton, J.), this Court concluded that the FTCA's statute of limitations was not jurisdictional in nature and that as a consequence the defendant's motion to dismiss could only be raised under Rule 12(b)(6), not Rule 12(b)(1).  Smith, 518 F. Supp. 2d at 147-49.  The Court further held that because the defendant's argument regarding the timeliness of the plaintiff's claims turned on facts that were not mentioned in the plaintiff's amended complaint, but rather came from "extraneous exhibits attached to the [defendant's] motion," the Court "[could not]

consider this evidence without converting the [defendant's] motion into one for summary

judgment." Id. at 154.

Having made these determinations, the Court in Smith nevertheless deemed it appropriate

to decide the statute of limitations issue before it without providing notice or the opportunity for

discovery to the parties.  Id. at 154-55.  The Court explained its rationale as follows:

> In this case, the government made what it believed to be a factual
> challenge to the Court's subject-matter jurisdiction pursuant to
> Rule 12(b)(1).  The plaintiff, also under the mistaken impression
> that the government's statute of limitations argument was properly
> before the Court under a Rule 12(b)(1) motion, submitted
> affidavits and exhibits in response to the government's evidence.
> Under these circumstances, the plaintiff "cannot claim to be caught
> in surprise" by the Court's consideration of the exhibits and
> affidavits submitted by the parties.  [Access 4 All v. Trump Int'l
> Hotel and Tower Condo., 458 F. Supp. 2d 160, 165 (S.D.N.Y.
> 2006)].  If anything, the Court's consideration of the evidence
> submitted by the parties under Rule 56(c) requires less evidence
> from the plaintiff than would have been necessary on a Rule
> 12(b)(1) motion because the Court can resolve disputed facts in
> adjudicating the latter type of motion.

Id. at 155 (emphasis in original).

Although the facts in this case differ somewhat from those in Smith, the principle

informing that decision applies with equal force in this case.  Like the parties in Smith, both the

plaintiffs and the defendants have assumed that the defendants' exhaustion argument is properly

raised under Rule 12(b)(1), and that that the defendants' challenge to the Court's subject-matter

jurisdiction is "factual" in nature; i.e., not based on allegations in the plaintiffs' second amended

complaint.  See Al-Owhali, 279 F. Supp. 2d at 20 (distinguishing "factual" challenges to subject-

matter jurisdiction, which are "addressed to the underlying facts contained in the complaint,"

from "facial" challenges, which "attack[] the factual allegations of the complaint that are

contained on the face of the complaint" (internal quotations and citations omitted)).

Consequently, the plaintiffs in this case, like the plaintiff in <u>Smith</u>, have already been put on notice that they must either produce some evidence to rebut the evidence submitted by the defendants or, if necessary, request discovery on the issue from the defendants.  Instead, the plaintiffs have chosen not to dispute the defendants' factual assertions regarding exhaustion of their administrative remedies (indeed, they acknowledge that they have not done so), arguing only that exhaustion of the DOI's internal appeals process is not required.

Under these circumstances, the Court perceives no prejudice to the plaintiffs in converting the defendants' motion to dismiss into one for summary judgment without providing notice and an opportunity for discovery to the plaintiff.  It will therefore address the merits of the defendants' exhaustion argument.

ii. <u>Need for exhaustion</u>

"Exhaustion of administrative remedies is generally required before seeking judicial review so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision."  <u>Wilbur v. CIA</u>, 355 F.3d 675, 677 (D.C. Cir. 2004) (internal quotation and citation omitted).  However, "courts have developed exceptions to the [non-jurisdictional] exhaustion requirement in circumstances where the reasons supporting the doctrine are found inapplicable."  <u>Randolph-Sheppard Vendors of Am. v. Weinberger</u>, 795 F.2d 90, 104 (D.C. Cir. 1986) (internal quotation and citation omitted).  "For example, exhaustion may be excused if delaying judicial review would cause irreparable injury, if the agency is not competent to address the issue or to grant effective relief, or if further pursuit of an administrative remedy would be futile."  <u>Ass'n of Flight Attendants v. Chao</u>, 493 F.3d 155, 159 (D.C. Cir. 2007).  "In these circumstances, the district court may, in its discretion, excuse exhaustion if 'the litigant's interests in immediate judicial review outweigh the government's

interests in the efficiency of administrative autonomy that the exhaustion doctrine is designed to further.'" Avocados Plus, 370 F.3d at 1247 (quoting McCarthy v. Madigan, 503 U.S. 104, 146 (1992) (further internal quotation and citation omitted)).

Requiring the plaintiffs to exhaust their administrative remedies with respect to their claims against Secretary Kempthorne would not effectuate the rationale underlying the exhaustion rule. "Non-jurisdictional exhaustion serves three functions: giving agencies the opportunity to correct their own errors, affording parties and courts the benefits of agencies' expertise, and compiling a record adequate for judicial review." Avocados Plus, 370 F.3d at 1247 (internal quotation and citation omitted). None of these functions would be furthered by forcing the plaintiffs to litigate their claims against Secretary Kempthorne through the DOI's appeals process while at the same time litigating their claims against Secretary Leavitt before this Court. To the contrary, the DOI would not have an opportunity to "correct [its] own errors," id., before the Court ruled on the validity of the plaintiffs' Rate Dilution Claim, see infra part III.B.1, and would likely be unable to address the validity of the plaintiffs' Carry-Forward Claim before this Court resolved that issue as well, see infra part III.B.2. Consequently, the Court would almost certainly not have "a record adequate for judicial review" before it resolved all of the claims raised by the plaintiffs in this case, much less "the benefits of [the] agenc[y's] expertise." Avocados Plus, 370 F.3d at 1247.

Further, there can be little doubt that "the [plaintiffs'] interests in immediate judicial review outweigh [Secretary Kempthorne's] interests in the efficiency of administrative autonomy." McCarthy, 503 U.S. at 146. The plaintiffs initiated this lawsuit nearly six years ago and have endured multiple rounds of briefing on a variety of issues, many of which are inordinately complex. Prior to that, they exhausted—with certain exceptions, see infra part

III.A.2—the remedies provided to them by the CDA.  To force the plaintiffs to return to the DOI

for additional administrative review while at the same time prosecuting their Indian Self-

Determination Act claims against Secretary Leavitt in this Court would be unduly onerous.

Moreover, Secretary Kempthorne would in all likelihood not benefit from this process, either, as

he could conceivably be bound by the preclusive effects of the Court's rulings in this case

without having the opportunity to take part in the merits of the case.  Honoring his

"administrative autonomy" under such circumstances could hardly be described as "efficien[t]."

McCarthy, 503 U.S. at 146.

"When the logic supporting the exhaustion doctrine is not applicable, a plaintiff's failure

to exhaust administrative remedies may be excused."  Arizona v. Shalala, 121 F. Supp. 2d 40, 50

(D.D.C. 2000).  Here, there is no discernible reason whatsoever to force the plaintiffs to exhaust

the DOI's internal appeals process.  The defendants' request that the Court dismiss the plaintiffs'

claims against Secretary Kempthorne for failure to exhaust those remedies must therefore be

denied.

    2.    <u>Exhaustion of claims under the CDA</u>

In addition to their arguments regarding Secretary Kempthorne, the defendants contend

that the Court lacks subject-matter jurisdiction over many of the breach of contract claims raised

by the plaintiffs on the grounds that those claims were either improperly presented to the IHS

under the terms required by the CDA or not presented to the agency at all.  Defs.' Mem. at 18;

Defs.' Reply/Cross-Opp'n at 3-5.  In its prior memorandum opinion issued in 2004, the Court

described the exhaustion requirements of the CDA, which must be followed by the plaintiffs

pursuant to 25 U.S.C. § 450m-1, as "a jurisdictional prerequisite to the filing of a complaint

under the CDA."  Tunica-Biloxi, slip op. at 10 (internal quotation and citation omitted).  The

parties do not suggest that this determination was incorrect.  See Defs.' Mem. at 17 (describing

§ 450m-1 as "[the Indian Self-Determination Act's] jurisdictional provision"); Defs.'

Reply/Cross-Opp'n at 6 (referencing the "jurisdictional prerequisites of the CDA"); Pls.' Mem.

at 33 (arguing that "the judge-made rule of exhaustion is discretionary" with the exception of

"the CDA requirement regarding money damages").  The Court will therefore adhere to its own

law of the case regarding this matter and deem the plaintiffs' compliance with the exhaustion

requirements of the CDA to be a jurisdictional prerequisite to the Court's consideration of those

claims.  See Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1988) (noting that

"as a rule courts should be loathe" to "revisit prior decisions" unless there are "extraordinary

circumstances such as where the initial decision was clearly erroneous and would work a

manifest injustice" (internal quotation and citation omitted)); see also Indep. Petroleum Ass'n of

Am. v. Babbit, 235 F.3d 588, 597 (D.C. Cir. 2001) (explaining that the doctrine of law of the

case "applies to jurisdictional issues").[12]

　　　The defendants identify a number of supposed defects with Ramah Navajo's claims.

They argue that Ramah Navajo (1) "did not present any contract disputes related to its 1997

contract," (2) did not present its Carry-Forward Claim for 1998, and (3) did not present its claims

for 1999-2003 with sufficient specificity to provide "a clear statement of their basis and

amount."  Defs.' Mem. at 18.  The defendants also take issue with a number of new claims

supposedly raised by the plaintiffs in their opposition and cross-motion for partial summary

judgment, including (1) the plaintiffs' claim that the DOI deducted over-recoveries by the

plaintiffs in a given year from the indirect cost amount (the numerator in the indirect cost rate

---

[12]  In any event, even if the Court were to reconsider its finding that the exhaustion requirements of the CDA are
jurisdictional in nature, it would simply treat the defendants' motion as a motion to dismiss under Rule 12(b)(6) and
convert the motion to one for summary judgment under Rule 56 just as it did with respect to the defendants'
exhaustion defense regarding Secretary Kempthorne.

equation) to be divided by the equitable distribution base (the denominator in the equation) for two years in its carry-forward accounting methodology rather than one (a practice the parties refer to as "double-dipping"), (2) the plaintiffs' claim that the DOI counted funds diverted from other programs or the plaintiffs themselves to cover indirect costs as indirect cost recoveries for purposes of calculating the total amount of indirect costs recovered in a given year, and (3) Ramah Navajo's claim that the DOI counted funds for purposes of calculating the total amount of indirect costs recovered in a given year that cannot be counted for that purpose pursuant to the Augustus F. Hawkins-Robert T. Stafford Elementary and Secondary School Improvement Amendments of 1988, Pub. L. No. 100-297 (1988). Defs.' Reply/Cross-Opp'n at 4. They add in their reply memorandum that "[Ramah Navajo] failed to present a claim for 2001." Id.[13]

> a.    Newly-alleged accounting irregularities

As an initial matter, the Court agrees with the defendants that any alleged errors in the DOI's accounting practices not identified in the plaintiffs' CDA claims cannot be asserted now. The Court expounded at length upon the scope of the CDA's presentment requirement in its prior memorandum opinion. Relying upon Cerberonics, Inc. v. United States, 13 Cl. Ct. 415 (Cl. Ct. 1987), the Court explained that "[i]f the complaint brought in [this Court] is based on the same set of operative facts underlying the claim presented to the [IHS], then this [C]ourt has jurisdiction under the CDA," Tunica-Biloxi, slip op. at 11 (quoting Cerberonics, 13 Cl. Ct. at 417) (alterations made by the Court in Tunica-Biloxi; additional alterations made by the Court in this memorandum opinion), but went on to note that "[t]he critical test" for determining whether

---

[13] The defendants also point to putative inconsistencies in the calculations of damages proffered by the plaintiffs, which, they suggest, "raise serious questions about the accuracy of [the p]laintiffs' CDA certifications." Defs.' Reply/Cross-Opp'n at 6. The "certifications" referenced by the defendants are required by 41 U.S.C. § 605, which states in pertinent part that "[f]or claims of more than $100,000, the contractor shall certify[, inter alia,] . . . that the amount requested [by the contractor] accurately reflects the contract adjustment for which the contractor believes the government is liable." 41 U.S.C. § 605(c)(1). If the defendants truly believe that the plaintiffs' CDA certifications are defective, they should say so outright. Insinuations to that effect do not enhance their position with the Court.

two or more claims are "based on the same set of operative fact[s]" is "whether the scheme of adjudication prescribed by the CDA is undermined by the [plaintiffs'] claim," id. (quoting Cerberonics, 13 Cl. Ct. at 418) (alterations made by the Court in Tunica-Biloxi; additional alterations made by the Court in this memorandum opinion).  Contrasting Cerberonics with Johnson Controls World Services, Inc. v. United States, 43 Fed. Cl. 589 (Fed. Cl. 1999), the Court concluded that separate CDA claims are based on the same "operative facts" if they seek the same relief under different legal theories, Tunica-Biloxi, slip op. at 11-12 (citing Cerberonics, 13 Cl. Ct. at 418-19), but that under the CDA claims are not based on the same "operative facts" if they apply the same legal theories to different facts in pursuit of separate requests for relief, id. at 12-13 (citing Johnson Controls, 43 Fed. Cl. at 594-95).

The accounting practices disputed by the plaintiffs for the first time in their memoranda of law—the DOI's alleged "double-dipping" with respect to over-recoveries and allegedly impermissible consideration of certain funds in calculating the amount of indirect costs received by the plaintiffs for a given year—fall into the latter category of claims.  Unlike the modified claim raised by the plaintiff in Cerberonics, these alleged accounting irregularities give rise to entirely different damages for each of the years in which the practices occurred.  By failing to raise these alleged errors with the IHS prior to raising them before this Court, the plaintiffs have "circumvent[ed] the statutory role of the contracting officer to receive and pass judgment on [those] claim[s]."  Cerberonics, 13 Cl. Ct. at 418 (quoted with approval in Tunica-Biloxi, slip op. at 11).

The plaintiffs note that "[the d]efendants' rate-making methodology is complex and convoluted," and suggest that they "cannot be faulted because new elements of miscalculation of rates emerged in discovery."  Pls.' Cross-Reply at 3.  This is as good an excuse as any for the

plaintiffs not to have raised the irregularities delineated above in their CDA claims before the

IHS, but the CDA's exhaustion requirement, being jurisdictional in nature, "is inflexible and

without exception." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 95 (1998) (internal

quotation and citation omitted). The accounting errors alleged by the plaintiffs for the first time

in their memoranda of law are not properly before the Court and as such will be dismissed for

lack of subject-matter jurisdiction.

b.     Ramah Navajo's claims for fiscal years 1999-2003

Much of the parties' analysis in the exhaustion context is devoted to Ramah Navajo's

claims for fiscal years 1999-2003, an understandable allocation of resources given that these

fiscal years comprise the bulk of Ramah Navajo's remaining claims.[14]  The defendants contend

that these claims must be dismissed because Ramah Navajo "failed to specify the amount of

[contract support costs] that it claimed under each theory" presented in its letter to the IHS.

Defs.' Mem. at 18.  Ramah Navajo disputes this notion. Pls.' Mem. at 28 ("[Ramah Navajo]

provided specific dollar amounts for [its] claims.").

There is "no requirement in the [CDA] that a 'claim' must be submitted in any particular

form or use any particular wording;" rather, "[a]ll that is required is that the contractor submit in

writing to the contracting officer a clear and unequivocal statement that gives the contracting

officer adequate notice of the basis and amount of the claim."  Contract Cleaning Maint., Inc. v.

United States, 811 F.2d 586, 592 (Fed. Cir. 1987).  The requirement that the contractor provide

---

[14]  The Court has already dismissed any claims asserted by either of the plaintiffs for any fiscal year prior to 1995.
See Tunica-Biloxi, slip op. at 9 n.9 ("[The p]laintiffs concede that claims relating to years prior to fiscal year
1995 . . . are outside the claims they may pursue before the Court. . . . The Court will limit [the] plaintiffs' request
for relief accordingly." (internal quotation and citation omitted)).  Thus, if the Court were to dismiss Ramah
Navajo's claims for fiscal years 1999-2003, the only claims still available to that plaintiff would be claims for fiscal
years 1995-96 and, in accordance with the Court's analysis below, a partial claim for fiscal year 1998.  See infra part
III.A.2.c-III.A.2.d.

notice of the amount of the claim means only that "the amount claimed must be stated in a manner which allows for reasonable determination of the recovery available at the time the claim is presented and/or decided by the contracting officer." Metric Constr. Co. v. United States, 1 Ct. Cl. 383, 391 (Cl. Ct. 1983). Thus, the contractor need not actually spell out the amount of damages arising from its claim if "the amount of the claim would be easily determinable" through "simple arithmetic." Id. at 392.

Ramah Navajo's CDA claims for fiscal years 1999-2003 meet this standard. In the body of its September 21, 2005 letter, Ramah Navajo delineates three separate claims against the IHS for each fiscal year between 1999 and 2003, including a Rate Dilution and Carry-Forward Claim. Attached to this letter is a three-page spreadsheet delineating the damages suffered by Ramah Navajo with respect to each of these claims for each of the fiscal years addressed in the letter. Second Supplemental Ramah Navajo CDA Claim at 3-5. Column Q of that spreadsheet, labeled "Additional Shortfall Caused by Use of [I]ncorrect IDC Rate," sets forth the amount of lost indirect cost funding caused by the IHS's rate dilution. Id. at 4. Column T1, labeled "Failure to Carry[ F]orward Both []Over[-]Recoveries[]/Under[-]Recoveries from [O]ther [F]ederal [A]gencies," and Column T2, labeled "IHS Use of Theoretical Recoveries to [C]ompute Carry[-F]orwards," do the same with respect to the DOI's disputed carry-forward calculations. Id. at 5. While the spreadsheet is hardly a model of clarity, it nevertheless provides sufficient information for a reviewing agency like the IHS to calculate the amount of damages alleged for each claim through "simple arithmetic." Metric Constr., 1 Ct. Cl. at 392. It was therefore adequate to put the IHS on notice as to the nature and scope of the claims against it for fiscal years 1999-2003.

The Court finds equally unpersuasive the notion that Ramah Navajo somehow did not present a CDA claim for fiscal year 2001. While the spreadsheet attached to Ramah Navajo's

September 21, 2005 letter indicates that it would have received more indirect cost funding than it

needed even if the DOI had followed Ramah Navajo's preferred carry-forward techniques, <u>see</u>

<u>id.</u> at 5 (reflecting a projected net over-recovery of $19,245 for fiscal year 2001 using Ramah

Navajo's carry-forward methodology), that same spreadsheet clearly indicates that the amount of

Ramah Navajo's over-recovery for that year would have been much greater had the DOI not

engaged in their disputed carry-forward practices, <u>see</u> <u>id.</u> at 5 (indicating that Ramah Navajo

would have been awarded an additional $35,532 in funding for fiscal year 2001 had the DOI

included under-recoveries from other federal programs and $144,226 had it excluded theoretical

over-recoveries).  And while an over-recovery of any amount would have been carried forward

to subsequent years, thereby ensuring that Ramah Navajo would not, in the long run, have

received a windfall from any surplus over-recovery, those carry-forwards would have mitigated

Ramah Navajo's damages in subsequent fiscal years, not in 2001.  Accordingly, Ramah Navajo's

claims for fiscal year 2001 were properly presented to the IHS and are properly before the Court

now.

c.    <u>Ramah Navajo's claims for fiscal year 1997</u>

In its prior memorandum opinion, the Court dismissed any claims raised by Ramah

Navajo relating to 1997 for lack of presentment to the IHS in the first instance.  <u>Tunica-Biloxi</u>,

slip op. at 8-15.  Subsequent to that decision, Ramah Navajo filed a claim with the IHS for that

year.  Pls.' Ex. 72 (Letter from Bennie Cohoe, Executive Director, Ramah Navajo School Board,

Inc., to Veronica Zuni, Contracting Officer, Albuquerque Area Office, Indian Health Service

(July 31, 2007)) at 1-5.  As the defendants correctly point out, however, "[Ramah Navajo] has

not sought to amend its [second amended complaint] to include the 1997 claims."  Defs.'

Reply/Cross-Opp'n at 5; <u>see also</u> Compl. ¶ 7 (alleging only that Ramah Navajo's "administrative

43

claim filed August 31, 2001, . . . [has] been rejected"); Suppl. Compl. ¶¶ 3-4 (alleging only that

Ramah Navajo filed claims with the IHS fiscal years 1998-2003).

 The traditional practice of this Court has been to disregard "claim[s] asserted for the first

time in a memorandum of law" because those claims "[were] not made in the [plaintiff's]

original complaint or advanced in a motion to amend." Hamilton v. Paulson, 542 F. Supp. 2d 37,

61 (D.D.C. 2008) (Walton, J.) (internal quotation and citation omitted). This practice has been

tempered somewhat by the District of Columbia Circuit's ruling in Wiley v. Glassman, 511 F.3d

151 (D.C. Cir. 2007), where the Circuit Court held that it was inappropriate for another member

of this Court to "strike" a plaintiff's claim raised for the first time in the plaintiff's opposition to

the defendant's motion for summary judgment where "[t]he factual basis for [the plaintiff's]

'new' claim was substantially similar to [the plaintiff's properly raised claim] and

[the defendant] did not demonstrate that allowing [the plaintiff's] claim would cause undue

prejudice," id. at 159. Nevertheless, this Court concluded in Hamilton that its "interest in

maintaining some semblance of order in the procession of [the case before it]," Hamilton, 542 F.

Supp. 2d at 63, called for dismissal of a claim raised for the first time in a party's memorandum

of law, and that dismissal on these grounds would not run afoul of Wiley so long as the Court

afforded the plaintiff leave to file an amended complaint including the newly-alleged claim, id. at

62-63.[15]

 The Court will follow that approach here and dismiss Ramah Navajo's claims with leave

to file an amended complaint adding the necessary exhaustion allegations for fiscal year 1997.[16]

---

[15] To employ any other approach would result in mass confusion, as it would be difficult for a court like this one
with approximately 200 cases on its civil calendar at any given point in time to stay abreast of what claims are
before it in each individual case.

[16] Ramah Navajo evidently agrees with the Court that the plaintiffs will need to amend their second amended
complaint prior to raising any claim in this Court, as it suggests this exact approach with respect to its claims for
(continued) . . .

If Ramah Navajo chooses to amend its complaint in this fashion, the defendants can file a motion to dismiss that claim for the other reasons articulated in their reply and cross-opposition at that time.

        d.       <u>Ramah Navajo's Carry-Forward Claim for fiscal year 1998</u>

The defendants' arguments with respect to Ramah Navajo's Carry-Forward Claim for fiscal year 1998 require a more searching analysis.  The defendants argue that Ramah Navajo failed to assert its Carry-Forward Claim in its December 30, 2003 letter to the IHS.  Defs.' Mem. at 18.  This fact is demonstrably correct.  <u>See</u> Supplemental Ramah Navajo CDA Claim at 1-4 (asserting only Shortfall and Rate Dilution Claims for 1998).  Nevertheless, Ramah Navajo argues that this claim was "fairly raised" in its December 30, 2003 letter because it is "inextricably intertwined" with Ramah Navajo's Rate Dilution Claim.  Pls.' Mem. at 31.  The Court disagrees.

The Rate Dilution Claim challenges the use of OMB Circular A-87's cost allocation method as a means of determining indirect cost rates, on the theory that the IHS is responsible for payment of all of the indirect costs incurred by the plaintiffs rather than a mere proportional share of those costs.  <u>See</u> Supplemental Ramah Navajo CDA Claim at 3 ("Irrespective of other claims, the reduced indirect[]cost rate[,] when applied to IHS programs in the [equitable] base[,] results in an under[-]recovery from [the] IHS of the costs needed to operate IHS programs, thus violating the mandatory funding provisions of 25 U.S.C. §[]450j-1(g)[]."); Pls.' Mem. at 7 ("OMB Circular A-87 was designed to allocate administrative costs of federal programs for federal accounting purposes.  It was not intended to serve as a means for determining contract

---

fiscal years 2004-2006.  <u>See</u> Pls.' Mem. at 28 n.22 ("[Ramah Navajo] filed a contract dispute on June 22, 2007, for all challenged rate-making claims for the years 2004 through 2006. . . .  Depending on the Court's ruling . . . , an appropriate amendment to bring the claims for money damages up to date under [Federal Rule of Civil Procedure] 15(d) will be sought.").

prices for federal contracts."). The Carry-Forward Claim challenges the DOI's practice of

excluding shortfalls in the amount of funds appropriated by Congress for a given fiscal year in

tallying the amount (if any) of under-recoveries by the plaintiffs of indirect costs for a given

year, on the theory that the IHS is responsible for payment of all indirect costs incurred by the

plaintiffs regardless of whether Congress appropriates sufficient funds to cover those costs.  See

Pls.' Mem. at 9 (arguing that by "shunting most [fixed with carry-forward] under-recoveries,"

the DOI "defeats Congress'[s] mandate to provide full funding of indirect contract support to

Indian Self-Determination Act contractors").  Both claims arise from purported defects in the

methodology used by the DOI to calculate indirect cost rates, and both claims take as their

premise the notion that the IHS has an unconditional responsibility to pay all of the indirect costs

incurred by the plaintiff.

      But that is where the similarity ends.  With respect to each claim, the source of the

alleged error (limitation of funding to portion allocable to the IHS in the case of the former;

insufficient congressional appropriations in the case of the latter), the manifestation of the

alleged error (a larger equitable base, or "denominator" in the indirect cost rate equation, in the

case of the former; a smaller projection of indirect costs, or "numerator" in the indirect cost rate

equation, in the case of the latter), and the damages arising from the alleged error are distinctly

different.  Put another way, Ramah Navajo could have raised its Rate Dilution Claim even if the

DOI had never excluded appropriations shortfalls from its carry-forward computations, and it

could have raised its Carry-Forward Claim even if the DOI had never included direct funding

from other agencies and organizations in its equitable base.  But Ramah Navajo could not have

raised both Rate Dilution and Carry-Forward Claims without demonstrating the amount of

funding lost by each of these alleged practices because the damages arising from them are

discrete and cumulative; i.e., they could not be determined by reference to each other, but only by engaging in separate analyses with respect to each claim, the results of which could then be considered together to produce a final damages calculation. In short, the claims are not "intertwined" at all, let alone "inextricably" so.

    3.  Summary

"It is well-established that a federal court cannot act in the absence of jurisdiction . . . ." Am. Library Ass'n v. FCC, 401 F.3d 489, 492 (D.C. Cir. 2005). Many of the claims raised by the plaintiffs over the course of this litigation are either not justiciable or were not properly presented to the IHS in the first instance, and therefore are not within this Court's subject-matter jurisdiction. The Court will therefore dismiss (1) any claims for damages arising from the plaintiffs' self-determination contracts with respect to Secretary Kempthorne, (2) any claims for damages premised on purported accounting irregularities not presented to the IHS in the first instance, (3) any claims by Ramah Navajo for damages for fiscal year 1997, and (4) Ramah Navajo's Carry-Forward Claim for fiscal year 1998.

B.    Merits of the Rate Dilution and Carry-Forward Claims

Having assessed which of the plaintiffs' various claims must be dismissed for lack of subject-matter jurisdiction, the Court now turns to the merits of their surviving claims. As all of these claims are permutations of either the Rate Dilution or Carry-Forward Claim, the Court will assess the merits of these two claims separately.

    1.  The Rate Dilution Claim

The Rate Dilution Claim is the heart of the plaintiffs' lawsuit. This claim arises from the plaintiffs' challenge to the use of OMB Circular A-87's cost allocation process for determining indirect cost funding for self-determination contracts under the Indian Self-Determination Act.

See Pls.' Mem. at 7 ("OMB Circular A-87 was designed to allocate administrative costs of federal programs for federal accounting purposes.  It was not intended to serve as a means for determining contract prices for federal contracts.").  In the plaintiffs' estimation, the circular should not be used in its current state "[because] most other federal and state agencies restrict or prohibit program monies['] use for administration," thereby "produc[ing] under[-]funding of [Indian Self-Determination Act-]mandated indirect costs."  Id.  The plaintiffs explain their predicament through the use of the following hypothetical:

> If, for example, the contractor has an IHS base of $1,000,000 and an indirect costs need (indirect cost pool) agreed to by [the] National Business Center of $500,000 and runs no other programs, its indirect cost rate is 50% (500,000[]÷[]1,000,000).   The contractor is entitled to "the Secretarial program" amount of $1,000,000 plus the total indirect cost pool amount of $500,000.
>
> If the contractor adds an additional program of $250,000 from another federal agency [that] does not allow or provide for any common costs to be charged to its program, [the d]efendants' methodology produces a rate of 40% ([500,000 ]÷[]1,250,000). Yet[, b]ecause of the generally inelastic nature of the common costs, the contractor's indirect cost pool does not adjust in the same proportion as changes in the base. . . . [The] IHS pays only $400,000 (40% [x] $1,000,000).

Id. at 8.  The plaintiffs contend that this result violates 25 U.S.C. § 450j-1(g), which requires the IHS to add "the full amount of funds to which the contractor is entitled" under § 450j-1(a). Section 450j-1(a), in turn, provides for the funding of  "reasonable" "contract support costs" in addition to the Secretarial amount.  Id. § 450j-1(a)(2).

As the plaintiffs repeatedly point out, this is not the first time that a court has passed on the merits of this argument.  In RNC, the Ramah Navajo Chapter (the "RNC") initiated a class-action lawsuit against Manuel Lujan, at that time the Secretary of the Interior, and numerous lower-level DOI officials in their official capacities based upon the inclusion of direct funding from other agencies and programs in the equitable base used to determine indirect cost rates

implemented by the Bureau of Indian Affairs (the "BIA") in its self-determination contracts with tribes and tribal organizations.  RNC, 112 F.3d at 1459.  The district court concluded that the suit was without merit, reasoning that the BIA was only required to pay indirect costs "associated with" its programs pursuant to § 450j-1(d)(2), and that the indirect cost rate formula in OMB Circular A-87 "set forth the appropriate method for determining what indirect costs were 'associated with' self-determination contracts."  Id. at 1460.  It therefore granted summary judgment in the defendants' favor.  Id.

The Tenth Circuit reversed this ruling.  Id. at 1463.  While it conceded that the phrases "reasonable costs" in § 450j-1(a)(2) and "associated with" in § 450j-1(d)(2) were ambiguous, it held that this ambiguity benefited the plaintiffs because "federal statutes are to be construed liberally in favor of Native Americans, with ambiguous provisions interpreted to their benefit." Id. at 1461.  Finding the plaintiffs' construction of § 450j-1 as "requir[ing] full funding of indirect costs and prohibit[ing] any adverse adjustments stemming from the failure of other agencies to pay their full share of indirect costs" to be "reasonable and consistent with the legislative history accompanying the 1988 amendments [to the Indian Self-Determination Act]," the court was "constrain[ed]" by "the canon of construction favoring Native Americans," id. at 1462 (internal quotation and citation omitted), to "conclude [that the] defendants unreasonably interpreted the Act by applying the pre-amendment indirect costs formula to determine the amount of indirect costs funding [that the] plaintiff would receive," id. at 1463.

The plaintiffs argue that RNC is binding on the IHS under the doctrine of collateral estoppel, Pls.' Mem. at 15-22; Pls.' Cross-Reply at 7-12, and that the Tenth Circuit's interpretation of § 450j-1 is correct in any event, Pls.' Mem. at 12-14, 43-50; Pls.' Cross-Reply at 6-7.  The defendants assert that they are not bound by RNC, Defs.' Mem. at 45-49; Defs.'

Reply/Cross-Opp'n at 11-18, and that the Tenth Circuit erred in its interpretation of the Indian

Self-Determination Act, Defs.' Mem. at 38-41, 43-45, 49-52; Defs.' Reply/Cross-Opp'n at 8-9,

20-22.  Instead, they advocate for an interpretation of the statute that would deem any amount of

indirect cost funding negotiated between a tribe or tribal organization and the IHS, and any

indirect cost rate negotiated between that tribe or tribal organization and the DOI pursuant to

such a contract, to be "reasonable."  Defs.' Mem. at 22-25; Defs.' Reply/Cross-Opp'n at 8-9, 20.

        a.      Collateral estoppel

        Before the Court can decide whether it should follow the Tenth Circuit in interpreting

§ 450j-1 to require full funding of all indirect costs incurred by a contracting tribe or tribal

organization, it must determine whether it is required to follow that decision under the doctrine

of collateral estoppel as posited by the plaintiffs.  "The doctrine of collateral estoppel, or[,] as it

is now commonly called[,] issue preclusion,[17] . . . provides that 'once an issue is actually and

necessarily determined by a court of competent jurisdiction, that determination is conclusive in

subsequent suits based on a different cause of action involving a party to the prior litigation.'"

Thomas v. Powell, 247 F.3d 260, 262-63 (D.C. Cir. 2001) (quoting Montana v. United States,

440 U.S. 147, 153 (1979)).  It "is intended to protect the parties from the burden of relitigating

the same issue following a final judgment and to promote judicial economy by preventing

needless litigation."  Consol. Edison Co. of N.Y., Inc. v. Bodman, 449 F.3d 1254, 1258 (D.C.

Cir. 2006) (internal quotation and citation omitted).  For the doctrine to apply:

                (1)[] the same issue now being raised must have been contested by
                the parties and submitted for judicial determination in the prior

---

[17] Technically, "issue preclusion" encompasses both the doctrine of collateral estoppel and the doctrine of "direct estoppel."  Taylor v. Sturgell, ___ U.S. ___, ___ n.5, 128 S. Ct. 2161, 2171 n.5 (2008).  However, the doctrine is more commonly associated with collateral estoppel.  See Restatement (Second) of Judgments § 27 cmt. b (1980) ("Issue preclusion in a second action on the same claim is sometimes designated as direct estoppel.  If, as more frequently happens, the second action is brought on a different claim, the rule of [issue preclusion] applies; in such cases, preclusion is sometimes designated as collateral estoppel.").

case; (2)[] the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case; and (3)[] preclusion in the second case must not work a basic unfairness to the party bound by the first determination.

United States v. Hoover-Hankerson, 511 F.3d 164, 171 (D.C. Cir. 2007) (internal quotation and citation omitted).

The first two criteria are easily satisfied here.  While the parties quibble over the similarity of the facts in this case to those in RNC, see Defs.' Mem. at 45-49 (arguing that the plaintiffs' indirect costs are variable, unlike the fixed costs at issue in RNC, and that the plaintiffs receive some indirect cost funding from other agencies, unlike the plaintiffs in RNC); Pls.' Mem. 50-53 (disputing the former assertion), the legal issue decided by the Tenth Circuit— whether the Indian Self-Determination Act requires the applicable Secretary to fund all indirect costs incurred by a contracting tribe or tribal organization or just the Secretary's pro rata share— is the same question raised here with respect to the plaintiffs' Rate Dilution Claims, compare RNC, 112 F.3d at 1461 (defining the "precise question" before the court as "the extent to which indirect costs are to be funded by [the] defendants"), with Pls.' Mem. at 12 ("The Secretarial amount together with the full amount of [contract support costs] necessary to operate the program without dimunition of services represents the contract price term."  (emphasis removed)); see also United States v. Stauffer Chem. Co., 464 U.S. 165, 172 (1984) (applying the doctrine of collateral estoppel in subsequent case where the issue presented by that case was identical to an earlier case and the "factual differences between the two cases . . . [were] of no legal significance whatever in resolving the issue presented in both cases").  Nor is there any question that this determination was "actually and necessarily determined" by the Tenth Circuit, or that the Tenth Circuit was a court "of competent jurisdiction" to make its determination. Hoover-Hankerson, 511 F.3d at 171.  Therefore, the only question requiring this Court's

attention is whether it would work "a basic unfairness" on the defendants to bind them to the court's determination in RNC.  Id.

"A person who was not a party to a suit generally has not had a full and fair opportunity to litigate the claims and issues settled in that suit." Taylor v. Sturgell, ___ U.S. ___, 128 S. Ct. 2161, 2171 (2008) (internal quotation and citation omitted).[18]  Therefore, only those defendants who actually or constructively participated in RNC are bound by the Tenth Circuit's decision. That list obviously includes the United States, which was a named defendant in RNC.  It also includes Secretary Kempthorne, for "[l]itigation involving the government is generally binding with respect to governmental officials who are sued in their official capacities in later actions," Headley v. Bacon, 828 F.2d 1272, 1279 (8th Cir. 1987), and former Secretary Lujan of the Department of the Interior was another named defendant in RNC.

Unlike Secretary Kempthorne and the United States, neither Secretary Leavitt nor his predecessor was named as a defendant in RNC.  But "[w]here a suit binds the United States, it binds its subordinate officials" as well.  Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 403 (1940).  Because the preclusive effects of the Tenth Circuit's decision on the United States

_____

[18] Unlike the doctrine of res judicata (also known as claim preclusion), "[i]ssue preclusion does not require mutuality of parties," Gov't of Rwanda v. Johnson, 409 F.3d 368, 374 (D.C. Cir. 2005), and "a plaintiff may, when appropriate, preclude a defendant from relitigating issues that the defendant litigated and lost against another plaintiff," S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co., 740 F.2d 1011, 1014 n.2 (D.C. Cir. 1984). "This practice . . . is called offensive collateral estoppel." Id.  However, a successful plaintiff in one proceeding cannot impose its victory on a second defendant not involved in the first proceeding without violating the second defendant's due process rights.  See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 329 (1971) ("Some litigants . . . have never had a chance to present their evidence and arguments on their claim.  Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position."); see also Taylor, ___ U.S. at ___, 128 S. Ct. at 2171 ("[O]ne is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." (internal quotation and citation omitted)); Agudas Chasidei Chabad of United States v. Russian Fed'n, 528 F.3d 934, 943 (D.C. Cir. 2008) ("Issue preclusion can be applied only as to an issue resolved against the party sought to be estopped . . . .").  Moreover, "non[-]mutual offensive collateral estoppel simply does not apply against the [United States] government." United States v. Mendoza, 464 U.S. 154, 162 (1984).  Consequently, "[c]ollateral estoppel will apply against the government only if mutuality of parties exists." AFL-CIO v. Fed. Labor Relations Auth., 835 F.2d 1458, 1462 (D.C. Cir. 1987).

must therefore be imputed to Secretary Leavitt, and because all three of the requirements for

collateral estoppel have been satisfied with respect to the United States, those requirements have

also been met with respect to Secretary Leavitt.[19]

But this determination does not end the Court's inquiry.  "Even when collateral estoppel

would otherwise apply, there are numerous exceptions."  <u>Pharm. Care Mgmt. Ass'n v. District of

Columbia</u>, 522 F.3d 443, 446 (D.C. Cir. 2008).  For example, "[c]ollateral estoppel is generally

inappropriate when the issue is one of law and there has been a change in the legal context after

the first decision."  <u>Id.</u> at 447.

The defendants assert that just such a change took place in 1998 when Congress enacted

25 U.S.C. § 450j-2.  That section of the Indian Self-Determination Act provides as follows:

> Before, on, and after October 21, 1998, and notwithstanding any
> other provision of law, funds available to the [IHS] in this Act or
> any other [a]ct for Indian self-determination or self-governance
> contract or grant support costs may be expended <u>only for costs
> directly attributable to contracts, grants[,] and compacts pursuant
> to the [Indian Self-Determination Act,] and no funds appropriated
> by this or any other [a]ct shall be available for any contract support
> costs or indirect costs associated with any contract, grant,
> cooperative agreement, self-governance compact, or funding
> agreement entered into between an Indian tribe or tribal
> organization and any entity other than the [IHS]</u>.

25 U.S.C. § 450j-2 (emphasis added.)

According to the defendants, this provision "state[s] unequivocally that the cost-shifting

endorsed by the Tenth Circuit [in <u>RNC</u>] was not permissible," thereby "foreclos[ing] any

argument that the [Indian Self-Determination Act] has ever allowed [the] IHS to pay indirect

---

[19]  Both Tunica and Ramah Navajo were members of the class of plaintiffs in <u>RNC</u>.  Pls.' Facts ¶ 13; <u>see also</u> Defs.'
Response ¶ 13 (admitting this fact).  Accordingly, they are "bound by [the] judgment [in that case] because [they
were] adequately represented by someone with the same interests who [were] a party to [that] suit."  <u>Taylor</u>, ___
U.S. at ___, 128 S. Ct. at 2172 (internal quotation and citation omitted); <u>see also id.</u> ("Representative suits with
preclusive effect on non-parties include properly conducted class actions . . . .").  The mutuality requirement for
application of the doctrine of collateral estoppel is therefore satisfied in this case.  <u>See supra</u> n.18.

costs attributable to non-IHS programs."  Defs.' Mem. at 43.  The plaintiffs, on the other hand,

argue that "the meaning and intent of § 450j-2 are anything but clear."  Pls.' Mem. at 44.  They

suggest that "[a] more plausible reading [of the statute] is that § 450j-2 prohibits using IHS direct

program mon[ies] to pay other agencies' <u>direct</u> [contract support costs]."  <u>Id.</u> at 44 n.37

(emphasis in original).

   The Court agrees with the plaintiffs that the language contained in § 450j-2 is inartful.

As the plaintiffs correctly point out, "[t]he section's literal requirement that no funds from any

appropriation whatever, including other agency appropriations, may ever be used to pay costs

'associated with' other agencies would destroy the force of the 1988 amendments" to the Indian

Self-Determination Act by eliminating the possibility of funding any indirect costs at all.  <u>Id.</u>; <u>see</u>

<u>also</u> Pls.' Cross-Reply at 11 ("Common costs are 'directly attributable' to [Indian Self-

Determination Act] programs and 'associated with' non-[Indian Self-Determination Act]

programs; they are not mutually exclusive.").  Section 450j-1(a) plainly requires that such costs

be funded by the IHS, <u>see</u> 25 U.S.C. § 450j-1(a)(3)(A) (providing for funding of "administrative

or other expense[s]" incurred by the contractor in addition to "direct program expenses"), and

"the [C]ourt must avoid an interpretation [of the statute] that undermines congressional purpose

considered as a whole when alternative interpretations consistent with the legislative purpose are

available."  <u>United States v. Braxtonbrown-Smith</u>, 278 F.3d 1348, 1352 (D.C. Cir. 2002).

   But this does not mean, as the plaintiffs appear to suggest, that the plain language of the

statute should be neglected altogether, for "whatever degree of confidence about congressional

purpose one derives from the legislative history, that purpose must find expression within the

permissible limits of the language before it can be given effect."  <u>United States ex rel. Totten v.</u>

<u>Bombardier Corp.</u>, 380 F.3d 488, 495 (D.C. Cir. 2004) (internal quotation and citation omitted).

Section 450j-2 explicitly states that "no funds" appropriated pursuant to the Indian Self-Determination Act shall be made available "for any contract support costs or indirect costs associated with" a contract or funding agreement between a contracting tribe or tribal organization and an entity other than the IHS.  (Emphasis added.)  However one might try to interpret this provision in accordance with the language of § 450j-1(a) and the overall goals of the Indian Self-Determination Act, the explicit ban on the funding of "indirect costs associated with" non-IHS contracts or funding agreements renders the plaintiffs' proffered interpretation of the statute untenable.  It simply is not possible to construe a statute that explicitly bans funding for indirect costs as somehow banning only direct costs.

Instead, the only plausible interpretation of § 450j-2 is the one favored by the defendants; i.e., that the statute prevents the IHS from paying more than its pro rata share of the indirect costs incurred by contracting tribes and tribal organizations.  Section 450j-2 explicitly prohibits the funding of indirect costs "associated with" non-IHS entities, but it does not explain how an indirect cost can be "associated with" a particular entity, a point noted by the Tenth Circuit in its analysis of identical language in § 450j-1(d)(2).  RNC, 112 F.3d at 1461.  Given the fungibility of indirect costs, the most logical way to approximate the segregation of such costs would be to allocate the costs on a pro rata basis, which is exactly what OMB Circular A-87 is designed to do.  In contrast to the plaintiffs' preferred reading of the statute, interpreting § 450j-2 to require the allocation of indirect costs in such a manner is at least not verboten under the terms of the statute, and is the best means of accomplishing the statute's apparent intent.

The defendants' interpretation of the statute also finds support in the legislative record.  Specifically, in its Report on the Department of the Interior and Related Agencies Appropriations Bill, 1999, the Committee on Appropriations for the House of Representatives expressed its

"concern[] about the [RNC] settlement," as well as the "decision" made by "the court in [that] case," which the Committee believed to be "erroneous." H.R. Rep. 105-609 at 57 (1998). The Committee twice "recommended . . . specifying that IHS funding may not be used to pay for non-IHS contract support costs." Id. at 108; see also id. at 110 (same). Congress evidently agreed with the Committee's recommendation, inserting language similar to that used by the Committee in the appropriations bill enacting § 450j-2. See Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. 105-277, Div. A, § 101(e), 112 Stat. 2681, 2681-280-2681-281 (1998) (enacting § 450j-2).

The plaintiffs argue in the alternative that even if the Court were to construe § 450j-2 as a direct refutation of the Tenth Circuit's holding in RNC, it cannot ascribe retroactive effect to that statute without violating the plaintiffs' contractual and constitutional rights. Pls.' Mem. at 45-46; Pls.' Cross-Reply at 10-11. This argument is beside the point. The salient question before the Court is not whether Congress repealed or amended § 450j-1(a) by passing § 450j-2—it obviously did neither, as the former statute was left intact by Congress—but whether the statute implicates the validity of the RNC court's interpretation of § 450j-1(a) in the first instance, such that it would be inappropriate for the Court to rely uncritically on that court's decision rather than assess the merits of the parties' positions itself. See Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572, 596 (1980) (noting that "the views of subsequent Congresses . . . are entitled to significant weight" in interpreting prior legislation, "particularly . . . when the precise intent of the enacting Congress is obscure"). With respect to this latter issue, Congress's mandate that the IHS not fund indirect costs "associated with" non-IHS contracts at least calls into question the propriety of the Tenth Circuit's determination that the "full amount of need for indirect costs associated with a self-determination contract" referenced in § 450j-1(d)(2) includes

costs that relate to services funded by contracts with entities other than the applicable Secretary's agency.

The Court therefore concludes that the defendants are not bound by the preclusive effects of RNC in this case.  The plaintiffs' tortured reading of the statute to the contrary, § 450j-2 contemplates a funding arrangement between the IHS and contracting tribes and tribal organizations different from that identified by the Tenth Circuit in RNC.  The newer statute must be considered in interpreting the provisions of § 450j-1, which forecloses blind adherence to the Tenth Circuit's decision.

        b.      Statutory construction of § 450j-1

With the issue of collateral estoppel resolved, the Court must now determine whether § 450j-1 requires that the IHS fully fund all of the plaintiffs' indirect costs or instead must fund only its pro rata share of those costs.  "[The] first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."  Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997).  "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."  Id. at 341.  "When [a court] find[s] the terms of a statute unambiguous, judicial inquiry should be complete except in rare and exceptional circumstances."  Freytag v. Comm'r of Internal Revenue, 501 U.S. 868, 873 (1991).  "However, where statutory language is ambiguous a court may resort to the canons of statutory interpretation and to the statute's legislative history to resolve the ambiguity."  United States v. Awadallah, 349 F.3d 42, 51 (2d Cir. 2003) (internal quotation and citation omitted).

Two subsections of § 450j-1 bear on the question of indirect cost funding.  The first is

§ 450j-1(a), which provides in pertinent part:

> (2) There shall be added to the amount required by paragraph (1)
> contract support costs[,] which shall consist of an amount for the
> <u>reasonable</u> costs for activities which must be carried on by a tribal
> organization as a contractor to ensure compliance with the terms of
> the contract and prudent management, but which—
>
>> (A) normally are not carried on by the respective Secretary
>> in his direct operation of the program; or
>>
>> (B) are provided by the Secretary in support of the
>> contracted program from resources other than those under
>> contract.
>
> (3)(A) The contract support costs that are eligible costs for the
> purposes of receiving funding under this subchapter shall include
> the costs of reimbursing each tribal contractor for <u>reasonable and
> allowable</u> costs of—
>
>> (i) direct program expenses for the operation of the
>> [f]ederal program that is the subject of the contract, and
>>
>> (ii) <u>any additional administrative or other expense related to
>> the overhead incurred by the tribal contractor in connection
>> with the operation of the [f]ederal function, service, or
>> activity pursuant to the contract</u>, except that such funding
>> shall not duplicate any funding provided under subsection
>> a(1) of this section.

25 U.S.C. §§ 450j-1(a)(2)-450j-1(a)(3)(A) (emphasis added).

As the <u>RNC</u> court noted in interpreting a prior version of this subsection, the seminal

modifier "reasonable" is not defined in the Indian Self-Determination Act.  <u>RNC</u>, 112 F.3d at

1461.  However, in § 450j-1(d), Congress provides some clarification as to what kind of funding

can be considered "reasonable":

> (1) Where a tribal organization's allowable indirect cost
> recoveries are below the level of indirect costs that the tribal
> organizations should have received for any given year pursuant to
> its approved indirect cost rate, and such shortfall is the result of

lack of full indirect cost funding by any [f]ederal, [s]tate, or other agency, such shortfall in recoveries shall not form the basis for any theoretical over-recovery or other adverse adjustment to any future years' indirect cost rate or amount for such tribal organization, nor shall any agency seek to collect such shortfall from the tribal organization.

(2) Nothing in this subsection shall be construed to authorize the Secretary to fund less than <u>the full amount of need for indirect costs associated with a self-determination contract</u>.

(Emphasis added).

Although § 450j-1(d)(2) technically applies only to subpart d(1) of the subsection (it limits everything "in [its] subsection"), the Court infers, as the Tenth Circuit inferred in <u>RNC</u>, that its description of the minimum amount of indirect cost funding required of the Secretary satisfies the "reasonable[ness]" standard of § 450j-1(a).  "Statutes must be read as a whole," <u>United States v. Atl. Research Corp.</u>, ___ U.S. ___, ___, 127 S. Ct. 2331, 2336 (2007) (internal quotation and citation omitted), and "[i]nterpretation of a word or phrase depends upon reading the whole statutory text," <u>Dolan v. United States Postal Serv.</u>, 546 U.S. 481, 486 (2006).  It would be illogical for Congress to have described the minimum amount of funding needed for indirect costs in one part of § 450j-1 and then describe that same requirement using different language unless the two descriptions were intended to be synonymous.  Interpreting the term "reasonable" in § 450j-1(a) by recourse to § 450j-1(d)(2) is the only reading of the statute that "ensure[s] that the statutory scheme is coherent and consistent."  <u>Ali v. FBI</u>, ___ U.S. ___, ___, 128 S. Ct. 831, 837 (2008).

The Court therefore construes the requirement in § 450j-1(a) that the applicable Secretary provide funding for all "reasonable" indirect costs to mean "the full amount of need for indirect costs associated with a self-determination contract" as stated in § 450j-1(d)(2).  However, this does not end the Court's inquiry, for as the <u>RNC</u> court recognized, "subsection (d)(2) refers to

indirect costs 'associated with' a self-determination contract, but fails to define 'associated with.'" RNC, 112 F.3d at 1461.  Like § 450j-1(a), § 450j-1(d)(2) is ambiguous in this regard.

"Typically, when a statute contains an ambiguous term, standard principles of statutory interpretation dictate that the Court defer to an agency's permissible construction of the statute pursuant to the Supreme Court's holding in Chevron U.S.A., Inc. v. Natural Res[ources] Def[ense] Council, Inc., 467 U.S. 837 [(1984)]."  Indian Educators Fed. Local 4524 v. Kempthorne, 541 F. Supp. 2d 287, 264 (D.D.C. 2008).  "However, the standard principles of statutory construction do not have their usual force in cases involving Indian law."  Muscogee (Creek) Nation v. Hodel, 851 F.2d 1439, 1444 (D.C. Cir. 1988).  In these situations, "[t]he governing canon of construction requires that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'"  Cobell v. Norton, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (citing Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985)).  "This departure from the Chevron norm arises from . . . principles of equitable obligations and normative rules of behavior[] applicable to the trust relationship between the United States and the Native American people."  Id. (internal quotation and citation omitted). "The result, then, is that if the [statutory text] can reasonably be construed as the [t]ribe [or tribal organization] would have it construed, it must be construed that way."  Muscogee, 851 F.2d at 1445 (emphasis in original).

The Court thus agrees with the Tenth Circuit that its reading of § 450j-1(d)(2) turns on the reasonableness of the plaintiffs' interpretation.  RNC, 112 F.3d at 1461-62.  But it is at this point that the RNC court's analysis goes awry.  After dismissing the defendants' interpretation of § 450j-1 as "unreasonable," that court concluded that the interpretation of the statute offered by the plaintiffs was "reasonable and consistent with the legislative history accompanying the 1988

amendments" to the Indian Self-Determination Act because "one of the primary concerns of Congress in enacting the amendments was the chronic under[-]funding of tribal indirect costs and the potential this under[-]funding caused for tribes to retrocede programs back to the federal government." Id. at 1462.  Given this reading of the legislative record, as well as Congress's directive to the defendants "to promulgate new implementing regulations for the 1988 amendments," the court "agree[d] with [the] plaintiff[s] that the 1988 amendments to the Act mandate[d] that tribes executing self-determination contract receive full funding for all reasonable contract support costs associated with self-determination contracts." Id. at 1463.

The Court takes issues with many of these conclusions, but its primary disagreement with the RNC court concerns the lack of specificity in the Tenth Circuit's analysis.  As best the Court can discern, the Tenth Circuit, having determined that the phrases "reasonable" (in § 450j-1(a)) and "associated with" (in § 450j-1(d)(2)) were ambiguous, abandoned consideration of the text of § 450j-1 altogether, focusing instead on whether it was reasonable to assume as a general matter that Congress would have wanted the applicable Secretary to fund all indirect costs that would otherwise go unsatisfied due to the lack of indirect cost funding by other entities providing direct funds to tribes or tribal organizations.  In so doing, the Tenth Circuit failed to consider whether the text of § 450j-1 could rationally sustain the interpretation proffered by the plaintiffs.

But § 450j-1, while ambiguous, is not infinitely pliable.  In particular, Congress's command in § 450j-1(d)(2) that the applicable Secretary fully fund "indirect costs associated with a self-determination contract" is subject to only two possible interpretations: either Congress intended for the applicable Secretary to pay for all indirect costs arising from services benefiting programs provided by self-determination contracts regardless of whether those costs

were covered in whole or in part by outside funding, or it intended for the applicable Secretary to pay for indirect costs that could be attributed to the self-determination contract (as opposed to other programs funded by outside entities that also benefited from the services giving rise to indirect costs).  As the Court has already explained, the only way to attribute costs of such a fluid nature is through a pro rata allocation of those costs.  See supra part III.B.1.a.

Moreover, the former interpretation does not accord with other parts of the statute.  For one thing, the Act references on several occasions—and at one point even defines—the term "indirect cost rate," which is inextricably linked with the allocation of costs.  See 25 U.S.C. § 450b(g) (defining the term "indirect cost rate" as "the rate arrived at through negotiation between an Indian tribe or tribal organization and the appropriate [f]ederal agency"); see also, e.g., id. § 450h(e)(1) (authoring the applicable Secretary to provide grants to tribal contractors so that they can obtain assistance in, inter alia, "the development of cost allocation plans for indirect cost rates"); id. § 450j-1(c) (requiring that the applicable Secretary prepare and submit an annual report to Congress including "the indirect cost rate and type of rate for each tribal organization that has been negotiated with the appropriate Secretary" and "the direct cost base and type of base from which the indirect cost base is determined for each tribal organization").  Indeed, § 450j-1(d)(1) contemplates a situation in which "a tribal organization's allowable indirect cost recoveries are below the level of indirect costs that the tribal organizations should have received for any given year pursuant to its approved indirect cost rate."[20]  There is, of course, no point in

---

[20]  Section 450j-1(d)(1) is an object lesson in the perils of statutory construction.  Read literally, the statute suggests that the applicable Secretary cannot count any under-payment arising from a shortfall in federal, state, or agency funding as an over-payment—a proposition that would strike most readers as self-evident.  This seemingly irrational provision is understandable only when one consults the Report of the Senate Indian Affairs Committee accompanying the bill that enacted the provision, which explains that the purpose of the subsection is to prevent the Secretary from counting any self-funding by a contracting tribe or tribal organization necessary to cover a shortfall in funding from another governmental entity as a "theoretical over-recovery" when calculating future indirect cost rates.  S. Rep. 100-274 at 12, 33 (1987).

having an indirect cost rate if the applicable Secretary is already obligated to pay all indirect costs under all circumstances.  The provision necessarily implies a pro rata funding scheme for indirect costs.  See TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  (internal quotation and citation omitted)).

A broad interpretation of the phrase "associated with" in § 450j-1(d)(2) also contradicts § 450j-2, which, as the Court noted above, explicitly bars the IHS from funding "indirect costs associated with" contracts, grants, and other funding agreements with non-IHS entities.  See supra part III.B.1.a.  Applying the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning," Comm'r of Internal Revenue v. Lundy, 516 U.S. 235, 250 (1996) (internal quotation and citation omitted), the Indian Self-Determination Act would, under a broad interpretation of § 450j-1(d)(2), both require the IHS to pay all indirect costs incurred by a tribal contractor (under that provision) and bar the IHS from paying any indirect costs incurred by a tribal contractor (under § 450j-2).  "A court must . . . interpret [a] statute as a symmetrical and coherent regulatory scheme, . . . and fit, if possible, all parts into an harmonious whole."  FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (internal quotation and citation omitted).  A broad interpretation of the phrase "associated with" in the Act would have the opposite effect.

Finally, and contrary to the RNC court's pronouncements, a broad interpretation of the phrase "associated with" finds no support in the legislative history underlying § 450j-1.  The Senate Indian Affairs Committee notes in its report accompanying the 1988 amendments to the Indian Self-Determination Act that "[t]he indirect cost method is a widely accepted management

tool for allocating costs common to many different programs and functions within a government entity," and that "[t]ribal indirect cost rates are negotiated and approved according to OMB guidelines by the [DOI]," S. Rep. 100-274 at 9 (1987).  It expresses no concern about this practice.  To the contrary, the Committee states that the intent of the legislature is "to make it absolutely clear that the Secretary of the Interior and the Secretary of Health and Human Services should fully fund tribal indirect costs <u>associated with</u> a self-determination contract," and that "[t]he term 'indirect costs' is used because it is associated with known management practices . . . recognized and defined in [OMB] Circular A-87," which "anticipates a variety of organizational structures, and therefore allows maximum flexibility while excluding unallowable costs," <u>id.</u> at 17 (emphasis added).  Congress, in other words, intended to amend the Indian Self-Determination Act to clarify that the applicable Secretary was obliged to fund indirect as well as direct costs, but conceived of such funding within the context of OMB Circular A-87's <u>pro</u> <u>rata</u> methodology.

In sum, the provisions of the Indian Self-Determination Act as well as the legislative history accompanying the 1988 amendments to the Act foreclose a broad interpretation of the phrase "associated with" in § 450j-1(d)(2).  The phrase must therefore be read as limiting the amount of indirect cost funding required of the applicable Secretary to those costs attributable to the Secretary's self-determination contract with the tribal contractor, which can only be determined through the use of a cost allocation procedure such as those envisioned in OMB Circular A-87.  Those costs not allocable to the Secretary need not be funded by him.

For their part, the plaintiffs do not argue that the use of an indirect cost rate as a means of allocating funding responsibilities should be abandoned altogether.  Instead, they follow the Tenth Circuit in suggesting that the Secretary must exclude any entity that provides direct

funding from the indirect costs pool if that entity does not fund indirect costs even though the programs funded by that entity would presumably benefit from those services giving rise to indirect costs.  Pls.' Mem. at 7-8.  This position was explained by the Tenth Circuit as follows:

> [The] defendants included in the direct costs base the funds [the] plaintiff received from the United States Department of Justice . . . . Although inclusion of these funds in the direct costs base would have been proper if those programs included funding for their apportioned share of the indirect costs pool, the uncontroverted facts indicate they did not.  By including the Department of Justice funds in the direct cost base, [the] defendants effectively and knowingly reduced the amount of funding they would provide to [the] plaintiff to cover the indirect costs pool and thereby deprived [the] plaintiff of full indirect costs funding for fiscal year 1989.

RNC, 112 F.3d at 1463.

The propriety of this assertion simply is not supported by the language of § 450j-1.  The statute speaks of indirect costs "associated with" the self-determination contracts at issue, which can only mean costs arising from services benefiting the programs directly funded by the Secretary.  Assuming that the phrase "associated with" implies some form of allocation of costs—an assumption the Court finds valid for all of the reasons listed above—the only way to quantify this "associate[ion]" is to consider all of the programs that benefit from the services that give rise to indirect costs, measure the amount and source of direct funding for each of those programs (or components of those programs), and allocate indirect costs in a manner proportional to that level of funding.  The plaintiffs' approach would short-circuit this process by forcing the applicable Secretary to fund indirect costs in excess of that proportional share.  The Secretary would, in effect, be required to fund indirect costs that are not "associated with" the self-determination contracts at issue.

Under the plaintiffs' approach, the Secretary would pay more or less depending on whether other providers of direct funding decided to contribute to indirect costs, not whether there were more or fewer providers of direct funding whose programs benefited from the services generating indirect costs.  A funding requirement of that nature would bear no association whatsoever to the programs actually funded by the self-determination contracts at issue.  It would simply require the Secretary to serve as a guarantor for other entities that fund direct but not indirect costs.  Such a result has no basis in the text of § 450j-1(d)(2).

   c. <u>Summary</u>

Canons of construction "are not mandatory rules," and "other circumstances evidencing congressional intent can overcome their force."  <u>Chickasaw Nation v. United States</u>, 534 U.S. 84, 94 (2001).  Here, the interpretation of § 450j-1 proffered by the plaintiffs would run afoul of the plain meaning of the governing statutory provision.  A broader interpretation, while not afoul of the plain language of the text, would render incoherent the overall statutory scheme and ignore the intent of Congress in crafting that provision.  The canons of construction in the plaintiffs' favor notwithstanding, these unreasonable interpretations must be rejected.

Instead, the only reasonable way to interpret § 450j-1(d)(2)'s requirement that the applicable Secretary fully fund all indirect costs "associated with" a self-determination contract is to read the statute as requiring the Secretary to fully fund his <u>pro rata</u> share of the indirect cost pool without regard to whether other members of that pool actually provide indirect cost funding.  This, in turn, means that funding indirect costs in a <u>pro rata</u> amount constitutes a "reasonable" amount of funding for purposes of § 450j-1(a).  The plaintiffs' Rate Dilution Claim, which takes as its premise the notion that the Secretary may, under certain circumstances, owe more than a

pro rata portion of the indirect cost pool, must therefore be dismissed.  The Court must therefore grant summary judgment in favor of the defendants on this issue.

2.     Carry-Forward Claim

The plaintiffs' Carry-Forward Claim is an altogether different matter.  The premise of this claim is not that the IHS violated the Indian Self-Determination Act by adopting the indirect cost rates crafted by the DOI using the basic indirect cost rate methodology set forth in OMB Circular A-87, but rather that the manner in which the DOI has adapted this methodology in the context of indirect cost funding for self-determination contracts is improper.  Specifically, the plaintiffs take issue with the DOI's practice of "shunting most [fixed with carry-forward] under-recoveries, which would otherwise operate to increase a future year's rate and recovery to pay back for a previous year's loss, into an arbitrarily non-recoverable slot called the 'shortfalls' column, which unjustifiably excludes them from normal carry[-]forward rate calculations."  Pls.' Mem. at 9.  According to the plaintiffs, this practice violates the minimum funding requirement of § 450j-1(a), the ban on "theoretical over-recoveries" set forth in § 450j-1(d)(1), and the provision governing the use of surplus recoveries by tribal contractors set forth in § 450j-1(a)(4). Id. at 9-10, 22-25; Pls.' Cross-Reply at 12-13.

The Court is eager to resolve this question given the long history of this case and the prolixity of the parties' filings.  Nevertheless, several reasons militate against adjudicating the Carry-Forward Claim at this time.  First and foremost, the Carry-Forward Claim, though not necessarily dependent on the notion that the Secretary is statutorily required to ensure that all indirect costs are fully funded, has been articulated in a manner that assumes such an obligation exists.  The Court's ruling today renders that assumption invalid.  Although the Court does not anticipate that this development would change the parties' positions with respect to the Carry-

Forward Claim, the parties should at least be given the chance to incorporate the Court's interpretation of the funding requirements of § 450j-1(a) into their arguments if they think that interpretation has some bearing on the merits of this claim.

Second, the Court recognizes that the Carry-Forward Claim has, to this point, been presented to it with limited discussion.  For example, the Court would anticipate that the defendants' arguments regarding the effect of limits placed on congressional appropriations on the funding obligations of the IHS would have some bearing on the validity of DOI's use of a "shortfalls" column to exclude under-recoveries caused by a lack of appropriations, yet this connection is never addressed by the defendants in their memoranda of law.[21]  This is apparently due in part to the proliferation of accounting errors asserted by the plaintiffs in their memoranda of law for the first time, most of which have now been dismissed by the Court, see supra part III.A.2.a, and in part due to the (necessary) page restrictions on the parties' memoranda of law imposed by the Court.  Regardless of the cause, the fact remains that the Carry-Forward Claim has seemingly not received adequate consideration by the parties.  It is therefore necessary to direct the parties to file supplemental memoranda of law addressing this claim in greater detail.

Finally, the Court hesitates to address one asserted accounting irregularity in the DOI's fixed-with-carry-forward methodology when so many other asserted problems in that methodology remain outside the Court's purview.  These issues were dismissed for technical reasons, see supra part III.A.2.a, and may yet be considered if the plaintiffs (1) present these claims (for years beyond 2003) to the IHS and (2) successfully amend their complaint to include these claims.  At a minimum, the plaintiffs should be afforded the opportunity to attempt to

---

[21]  Indeed, it is not entirely clear from the plaintiffs' memoranda of law whether they contest the use of a "shortfalls" column to exclude under-recoveries caused by an actual lack of appropriations in the abstract or simply challenge the defendants' alleged practice of placing under-recoveries not caused by a lack of appropriations into this category.

consolidate any other claims they desire to pursue in one forum and in one proceeding, lest the dispute between the parties sprawl into yet another lawsuit.

## IV. Conclusion

For all of the reasons set forth above, the Court declines to rule on the merits of the parties' cross-motions with respect to the plaintiffs' Carry-Forward Claim at this time, and will instead require the parties to submit supplemental memoranda of law regarding that claim.[22]  In ordering additional briefing, however, the Court is sensitive to the demands it has already placed on the parties in this case.  Further, the plaintiffs may wish to stay consideration of the issue so that they may file (and the Court may resolve) a motion for leave to file an amended complaint (presumably attempting to add the assertions of account improprieties with respect to fiscal years after 2003), a motion for reconsideration of the order accompanying this memorandum opinion, or a motion for leave to file an interlocutory appeal with the District of Columbia Circuit.  The Court would be inclined to resolve motions of this nature before addressing the merits of the Carry-Forward Claim.

The Court will therefore direct the parties to file a joint status report stating their views with respect to these issues before it sets a deadline for the filing of supplemental memoranda of law.  The parties should therefore indicate in that report whether they wish to stay further consideration of the parties' cross-motions regarding the Carry-Forward Claim pending the

---

[22]  The Court recognizes that it has not addressed many of the arguments raised by the defendants in their memorandum of law, such as their contention that § 450j-1(a) only requires the applicable Secretary to fund whatever amounts are decided through negotiation between the Secretary and the tribal contractor, their related contention that the plaintiffs have no valid breach of contract claim because the IHS paid the amounts promised to the plaintiffs in their self-determination contracts, and their assertions of waiver, estoppel, and an inequitable "windfall" to the plaintiffs should they succeed on the merits of their claims.  The Court has intentionally refrained from addressing these arguments because it has not yet been necessary for the Court to do so, but will resolve them, if necessary, if and when it adjudicates the balance of the parties' cross-motions.  Unless the parties perceive a specific connection between these arguments and the plaintiffs' Carry-Forward Claims that has not been previously discussed, the parties need not and should not address the merits of these arguments in their supplemental memoranda of law.  The Court will presume that they have incorporated their prior arguments on these issues by reference in their supplemental memoranda of law unless informed otherwise.

resolution of other anticipated motions by the plaintiffs or the defendants.  If that is their desire,

they should provide a joint proposed briefing schedule for their anticipated motions.  If not, they

should provide a joint proposed briefing schedule for (1) the defendants' supplemental

memorandum of law in support of their motion for summary judgment on the Carry-Forward

Claim, (2) the plaintiffs' supplemental memorandum of law in opposition to the plaintiffs'

motion and in support of their cross-motion for partial summary judgment on the Carry-Forward

Claim, (3) the defendants' consolidated supplemental reply in support of their motion for

summary judgment and opposition to the plaintiffs' cross-motion for partial summary judgment,

and (4) the plaintiffs' supplemental reply memorandum in support of their cross-motion for

summary judgment.

As for the claims actually addressed in this memorandum opinion, for the reasons set

forth above, the Court will dismiss the plaintiffs' claims for damages against Secretary

Kempthorne as well as those claims not properly presented to the IHS or to this Court.  Finally,

the Court will grant summary judgment in the defendants' favor with respect to the plaintiffs'

Rate Dilution Claim.

**SO ORDERED** this 22nd day of September, 2008.[23]

REGGIE B. WALTON
United States District Judge

---

[23] An order will be issued contemporaneously with this memorandum opinion (1) granting in part and denying in part the defendants' motion to dismiss or for summary judgment, (2) denying in part the plaintiffs' cross-motion for summary judgment, (3) dismissing without prejudice the plaintiffs' claims for damages against Secretary Kempthorne, the plaintiffs' claims insofar as they are premised on asserted errors in the carry-forward accounting methodologies employed by the DOI not raised before the IHS, any claims by Ramah Navajo for fiscal year 1997, and any claims by Ramah Navajo for fiscal year 1998 insofar as they are premised on asserted errors in the carry-forward accounting methodology employed by the DOI for that year, (4) granting summary judgment in the defendants' favor with respect to all of the remaining counts in the plaintiffs' second amended complaint and supplemental complaint insofar as those claims are premised on the defendants' inclusion of funding from entities that do not provide funding for indirect costs incurred by the plaintiffs in the direct funding base used to calculate an indirect cost rate for the plaintiffs, (5) staying the Court's consideration of the balance of the parties' cross-motions unless and until ordered otherwise by the Court, and (6) directing the parties to file a joint status report by a date certain that accords with the instructions set forth above.